COMMONWEALTH of Pennsylvania, Acting By Attorney General Thomas W. CORBETT, Jr.

v.

Wesley Alvin SNYDER, Sydney Snyder, Jacqueline Hepford–Rennie, Julie Ann Musser, Susan Louise Hunt, Kenneth Roger Bennetch, Cheryl Bennetch and Alyssha Mary Waid

Appeal of: Kenneth Bennetch.

Commonwealth of Pennsylvania, Acting by Attorney General Thomas W. Corbett, Jr.

v.

Wesley Alvin Snyder, Sydney Snyder, Jacqueline Hepford–Rennie, Julie Ann Musser, Susan Louise Hunt, Kenneth Roger Bennetch, Cheryl Ann Bennetch, Amy Lou Styer and Alicia Mary Waid

Appeal of: Julie Ann Musser.

Commonwealth of Pennsylvania, Acting by Attorney General Thomas W. Corbett, Jr.

v.

Wesley Alvin Snyder, Sydney Snyder, Jacquelyn Hepford–Rennie, Julie Ann Musser, Susan Louise Hunt, Kenneth Roger Bennetch, Cheryl Ann Bennetch, Amy Lou Styer, and Alicia Mary Waid

Appeal of: Jacquelyne Hepford–Rennie.

Commonwealth of Pennsylvania, Acting by Attorney General Thomas W. Corbett, Jr.

v.

Wesley Alvin Snyder, Sydney Snyder, Jacqueline Hepford–Rennie, Julie Ann Musser, Susan Louise Hunt, Kenneth Roger Bennetch, Cheryl Ann Bennetch, Amy Lou Styer, and Alicia Mary Waid

**Appeal of: Susan Louise Hunt.**

Commonwealth Court of Pennsylvania.

Argued April 2, 2009.
Decided June 9, 2009.

Robin J. Gray, Reading, for appellants, Kenneth R. Bennetch and Cheryl Ann Bennetch.

Elizabeth L. Long, Philadelphia, for appellant, Jacqueline Hepford–Rennie.

Kathryn L. Simpson, Harrisburg, for appellant, Julie Ann Musser.

Claudia M. Tesoro, Sr. Deputy Attorney General, Philadelphia, and William A. Slotter, Sr. Deputy Attorney General–in–Charge, Allentown, for appellee, Commonwealth of Pennsylvania.

BEFORE: COHN JUBELIRER, Judge, and SIMPSON, Judge (P.), and FRIEDMAN, Senior Judge.

1. Act of December 17, 1968, P.L. 1224, *as amended,* 73 P.S. §§ 201–1—201–9.3.

2. OPFM did business as six different entities: Personal Financial Management (a fictitious name); Image Masters, Inc., Mortgage Professionals, Inc.; Mortgage Professionals II, Inc., Discovered Treasures, Inc. and D.I.V.I.D.I.T., Inc. In its complaint, the

OPINION BY Judge SIMPSON.

In these consolidated appeals, four former mortgage consultants allegedly involved in a huge fraudulent mortgage scheme seek reversal of a preliminary injunction entered by the Court of Common Pleas of Berks County (trial court) in a consumer protection action brought by the Commonwealth, acting by Attorney General Thomas W. Corbett, Jr., (Commonwealth) pursuant to the Unfair Trade Practices and Consumer Protection Law (CPL).[1] Kenneth R. Bennetch, Julie Ann Musser, Jacquelyne Hepford–Rennie and Susan Louise Hunt (collectively, Consultants) contend the trial court erred or abused its discretion by enjoining them from working in the mortgage financing or investment products fields pending disposition of the Commonwealth's claims. For the following reasons, we conclude the trial court had reasonable grounds to issue the preliminary injunction.

## I. Background

### A. OPFM/Wesley A. Snyder

This consumer protection case arises out of transactions between OPFM, Inc. (OPFM), a now-defunct mortgage brokerage and investment group run by Wesley A. Snyder (Snyder) in Berks and Lancaster Counties,[2] and approximately 811 homeowners and 31 mortgage investors (Consumers). Snyder was OPFM's president and sole shareholder. In September 2007, OPFM filed for Chapter 7 bankruptcy. Thereafter, the United States Attorney for the Middle District of Pennsylvania

Commonwealth asserts these companies existed only on paper. All funds received by these entities were deposited into one account. There was no separate accounting. All bills were paid from the one account. Corporate formalities were not followed, and regular shareholder meetings were not held.

charged Snyder with operating a "Ponzi"[3] scheme that defrauded Consumers of more than $29,000,000. In November 2007, Snyder pled guilty in federal court to one count of mail fraud, a violation of 18 U.S.C. § 1341, resulting in a loss somewhere between $15,000,000 and $32,000,000. *See* Cmwlth. Ex. 3 (Snyder Guilty Plea). Snyder is now serving a 12–year sentence in a federal prison.

Of sole concern in this appeal is the part of the scheme involving the promotion and sale of a purported second mortgage known as a "wrap-around mortgage"[4] (Wrap Mortgage) under what OPFM marketed as the "Equity Slide Down Program." Of the 811 Wrap Mortgage Consumers, all but 22 sustained a loss. See Cmwlth. Ex. 3 (Snyder Guilty Plea) at 26. The total loss among the Wrap Mortgage group was approximately $26,600,000. *Id.* The highest individual loss was $201,897.

*Id.* The average loss for all Wrap Mortgage victims was $29,000. *Id.*

## B. Consultants

Consultants worked for OPFM for varying amounts of time as mortgage salespersons. They promoted and sold both conventional mortgages and Wrap Mortgages. Snyder trained Hepford–Rennie, the most senior consultant, who started in 1993. Hepford–Rennie later trained Bennetch, Musser and Hunt. Consultants met with Consumers who responded to OPFM's advertisements. Consultants discussed mortgage options with Consumers, including the Wrap Mortgage and the Equity Slide Down Program. They also took Consumers' applications and handled the ensuing settlements. Although Consultants were not licensed mortgage brokers, they worked for OPFM, a licensed mortgage broker.[5]

---

**3.** A Ponzi scheme is defined as: "A fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments. Money from the new investors is used directly to repay or pay interest to earlier investors, usu. without any operation or revenue-producing activity other than the continual raising of new funds." Black's Law Dictionary 1198 (8th ed. 2004).

**4.** A wrap-around mortgage is defined (with emphasis added) as "[a] second mortgage issued *when a lender assumes the payments on the borrower's low-interest first mortgage* (usu. issued through a different lender) *and lends additional funds.* Such a mortgage covers both the outstanding balance of the first mortgage and the additional funds loaned." Black's Law Dictionary 1033 (8th ed. 2004). Brian Crossland, a Department of Banking investigator, testified the Image Masters Wrap Mortgage was not a true "wrap-around" mortgage. *Image Masters did not lend Consumers anything* and *Consumers remained obligated to pay their conventional mortgages.* Reproduced Record (R.R.) at 897a.

Further, Lawrence J. Cottler, legal counsel for Lynn Feldman, OPFM's Chapter 7 bank-

ruptcy trustee, also opined that OPFM's Wrap Mortgages were not legitimate mortgages and were thus unenforceable. *Id.* at 739a. "Number one, I think we have a failure of consideration at the onset. Unlike the conventional mortgages whereby the homeowner actually receives funds from Chase or Wells Fargo ... the mortgage company, Image Masters didn't give these homeowners anything. Rather, these homeowners gave Image Masters stuff.... Image Masters still owes that money back to the homeowner; and yet for whatever reason, the homeowner then entered into a note and mortgage with Image Masters promising to pay more money to Image Masters." *Id.*

**5.** Section 2 of the former Mortgage Bankers and Brokers and Consumer Equity Protection Act (Brokers Act), Act of December 22, 1989, P.L. 687, *formerly* 63 P.S. § 456.302, in effect at all times relevant here, defined mortgage brokers as "[a] person who directly or indirectly negotiates or places mortgage loans for others in the primary market for consideration." Pursuant to Section 3(11) of the Brokers Act, *formerly* 63 P.S. § 456.303(11), employees of mortgage brokers are not required to be licensed, but are nonetheless subject to

Consultants were paid solely on a commission basis. They received an annual commission over the life of the Wrap Mortgage. The amount of the commission was based on the amount of the Wrap Payment to OPFM's subsidiary, Image Masters. In addition, any prepayments to Image Masters over the life of the Wrap Mortgage increased the amount of Consultants' annual commission. Consultants never disclosed to Consumers that they received commissions based on the Wrap Payment and Wrap Mortgage prepayments.

### C. The Wrap Mortgage Scheme

The Wrap Mortgage scheme worked as follows. OPFM advertised low interest rate mortgages in newspapers in Berks and Lancaster Counties. To obtain the discounted interest rate, Consumers needed to qualify for the Wrap Mortgage program. To qualify, Consumers needed a large down payment or a large amount of equity (at least 20%) in their property to "wrap around" their mortgage. The scheme required Consumers to determine the amount they needed or intended to borrow. Consumers were then convinced to execute a mortgage with a conventional lender for more than they actually needed. These mortgages were recorded in the County Recorder of Deeds' Office.

A few days later, Consumers executed a purported second mortgage (Wrap Mortgage) to OPFM subsidiary Personal Financial Management, and later to OPFM subsidiary Image Masters.[6] Consumers then turned over the equity (Wrap Pay-ment or Wrap Money) to Image Masters for Snyder to invest. In exchange, Consumers received an interest rate on the Wrap Mortgage usually one to two points lower than the rate on their conventional mortgages, depending on the size of the Wrap Payment. However, the Wrap Mortgage documents did not include any investment terms. In addition, contrary to normal practice, the Wrap Mortgages were not recorded.

As part of the Wrap Mortgage scheme, an OPFM entity promised to assume responsibility for Consumers' monthly payments on their conventional mortgages. An OPFM entity sent Consumers a commitment letter stating it would convert the conventional mortgage by changing some of its terms and conditions, and by lowering the interest rate. *See* Cmwlth. Ex. 15. The OPFM entity also required Consumers to sign a "Subrogation Agreement" that purported to render the conventional mortgage subordinate to the Wrap Mortgage. *See* Cmwlth. Ex. 19. However, OPFM never obtained any subrogation agreement from the conventional lenders. Moreover, as noted, the Wrap Mortgages were not recorded. Consumers signed a settlement statement which indicated Image Masters assumed the conventional mortgages. *See* Cmwlth. Exs. 30, 37, 48, 68, 76.

OPFM, through Image Masters, mailed monthly statements to Consumers. The first statement reflected a reduction in their Wrap Mortgage equal to their Wrap Payment. However, Consumers never received any statements from their conven-

---

the provisions of the statute. The Brokers Act was repealed by the Act of July 8, 2008, P.L. 796, known as the Mortgage Loan Industry Licensing and Consumer Protection Act (Mortgage Loan Act), 7 Pa.C.S. §§ 6101–51.

**6.** Alicia Waid (Bookkeeper) testified she kept the books for all of Snyder's companies. R.R. at 731a. Snyder created Image Masters sometime in 2000–02. *Id.* at 731a–32a. Snyder kept the OPFM books at one location and the Image Masters (Wrap Mortgage) books at another location. *Id.* Thus, the Department of Banking did not know Image Masters existed. *Id.* at 896a.

tional mortgage lenders regarding their conventional mortgage balance.[7] At closing, Consultants required Consumers to execute a change of address letter instructing their conventional lenders to forward all information, statements and correspondence regarding their accounts to: "[Consumer], c/o Image Masters, Inc, P.O. Box 144, Dept. 2007041, Oley, PA, 19547."[8] *See* Cmwlth. Exs. 23, 58.

In actuality, neither Image Masters nor its parent, OPFM, used Consumers' Wrap Money to pay down their conventional mortgages.[9] In addition, OPFM only invested a very small portion of the money it received. OPFM primarily used the money from new Consumers to pay the conventional mortgages of existing Consumers, thereby keeping the Ponzi scheme alive. OPFM also used Consumers' Wrap Money to pay its employees and expenses.

Further, although the Pennsylvania Department of Banking examined OPFM's mortgage business, it never became aware of the existence of Image Masters or the Wrap Mortgage program. Images Masters was not a licensed mortgage banker or broker. Snyder stored the Wrap Mortgage documents at a separate facility in Reading, Pa., that he owned in his own name to conceal the Wrap Mortgage scheme from Department auditors.

### D. Wrap Mortgage Documents

Consultants presented Consumers with the Wrap Mortgage documents at the second closing. The Wrap Mortgage documents consisted of a note and a mortgage. The note consisted of two pages in 12–point type. The mortgage consisted of six pages with 43 paragraphs in 8–point type.

Paragraph 21 of the Wrap Mortgage provided (with emphasis added):

> SENIOR MORTGAGE REMAINS IN EFFECT. Notwithstanding anything to the contrary therein contained, *Borrower covenants and agrees to keep the present senior mortgage in full force and effect for the entire term of that mortgage notwithstanding any other prepayment provisions there contained,* unless you sell or convey the property to any other Person, Firm or Corporation or completely refinance any and all indebtedness owed to Image Masters, Inc. (R.R. at 59a)

However, Consultants did not explain Paragraph 21 to Consumers. In addition, Consultants required Consumers sign a settlement statement, which provided on Line 206, "Loan Assumed-[amount of conventional loan]."[10] *See* Cmwlth. Exs. 30,

---

7. Bookkeeper Waid testified that even if Consumers paid off their Image Masters' Wrap Mortgage, they would not receive a statement indicating their conventional mortgage still existed. R.R. at 713a.

8. Because of the change of address form, Consumers never received any statements from their conventional mortgage lenders. R.R. at 713a–14a.

9. OPFM's bankruptcy trustee's legal counsel testified "[Snyder] was literally robbing Peter to pay Paul." R.R. at 738a. He comingled all funds into one account; every month money would come in and go out. *Id.* OPFM operated at an average deficit of at least a million dollars per year. *Id.* at 741a–42a.

10. Consumer Heather Keens testified that after the second settlement with Consultant Hepford–Rennie, it was her understanding that Image Masters assumed the first mortgage. R.R. at 762a–63a. Had she known she would be responsible for two mortgages, Consumer Keens never would have agreed to a Wrap Mortgage. *Id.* at 764a. Consumer Diane DeCoursey, who also dealt with Hepford–Rennie, testified: "I was told that the mortgage was being assumed by Image Masters, and I would be dealing strictly with Image Masters; and that's the way it was explained to me. And it sounded good, so that's what I did." *Id.* at 778a. Consumer Gail Keith, who dealt with Consultant Musser, testified: "The mortgage was to be with [Image Mas-

37, 48, 68, 76. Consultants also required Consumers to execute a fraudulent subrogation agreement that purported to render the recorded conventional mortgage subordinate to the unrecorded Wrap Mortgage. *See* Cmwlth. Ex. 19.

Paragraph 27 of the Wrap Mortgage provided (with emphasis added):

PREPAYMENT. The Borrower may prepay any of the Liabilities at any time in any amount. *However, any prepayment shall not accelerate the LENDER'S obligation hereunder to make payments on the Senior Mortgage as they are actually due.* (R.R. at 59a)

Many Consumers chose a Wrap Mortgage because it, unlike most conventional mortgages, permitted prepayment.[11] However, Consultants did not point out Paragraph 27, which provided that prepayment did *not* accelerate Image Masters' obligation to pay on the conventional mortgage, which remained in effect.[12] Further, Consultants did not inform Consumers that they had the option to insert language in the Wrap Mortgage stating that their conventional mortgage would be paid off when they paid off their Wrap Mortgage. OPFM's bookkeeper, Alicia Waid testified this provision was inserted in only five Wrap Mortgages. R.R. at 735a.

## E. Collapse of the Wrap Mortgage Scheme

OPFM engaged in the Wrap Mortgage scheme for approximately 20 years, beginning in 1986–87. The Wrap Mortgage program, a Ponzi scheme, annually paid out more than it received and consistently lost large amounts of money (approximately a million dollars per year). *Id.* at 741a–42a. Despite a cash infusion from another scam, the Mortgage Participation Program, Snyder's Ponzi scheme eventually collapsed.

---

ters]. We were getting the substantially lower interest rate because we were taking out the mortgage and responsible to pay Image Masters, and they were responsible—they were taking care of the other mortgage because, of course, she kept saying it's a matter of formalities, that we are not responsible for that mortgage." *Id.* at 792a. Consumer Mark Fansler, who dealt with Consultant Bennetch, testified: "As I recall, the words used was the word assume, that they would assume or assume the responsibility of that first loan." *Id.* at 871a. Consumer Marcia Stauffer testified Consultant Bennetch told her she had no responsibility for her conventional mortgage. *Id.* at 880a.

11. The Wrap Mortgage brochure Consultants provided Consumers stated, "Prepaying your mortgage will save you a fortune in interest!" R.R. at 48a.

12. Consumer Steven Inners testified Consultant Hepford–Rennie never pointed out Paragraph 27 or explained that different language could be added to Paragraph 27 requiring the conventional mortgage to be paid in full when the Image Masters mortgage was paid in full. R.R. at 757a. Consumer Keens also testified that Hepford–Rennie did not explain Paragraph 27 to her. *Id.* at 764a. Keens and her husband sold their stock in a family business to pay off their family home. *Id.* Keens testified they paid off their Wrap Mortgage, in the amount of $168,000 (including a $56,000 wrap payment), early in 2005. R.R. at 765a. In September 2007, Wells Fargo notified Keens she still owed $137,392.42 on her conventional mortgage. *Id.* at 765a–66a. Consumer Pamela O'Brien testified she asked Consultant Musser if she and her husband could make prepayments, and Musser told her they could. *Id.* at 782a. However, Musser did not explain Paragraph 27. *Id.* Consumer Keith also testified she wanted to make prepayments to pay down the mortgage faster and Consultant Musser told her that would not be a problem. *Id.* at 796a–97a. Musser did not explain Paragraph 27 to Keith or mention that the language of Paragraph 27 could be changed. *Id.* at 797a. Consumer Stauffer testified she told Consultant Bennetch that she wanted to pay off her mortgage before the 30–year term and Bennetch did not mention that prepayments on the Wrap Mortgage would not obligate Image Masters to apply them to the conventional mortgage. *Id.* at 879a.

In early 2007, OPFM started having problems making timely payments on Consumers' conventional mortgages. Around May or June 2007, Snyder advised his staff that OPFM was experiencing cash flow problems.

Consultant Hepford–Rennie testified she stopped selling Wrap Mortgages when OPFM started missing payments on the conventional mortgages. Significantly, however, Consultants Bennetch, Musser and Hunt continued to sell Wrap Mortgages after becoming aware of OPFM's financial problems. In September 2007, OPFM notified Consumers of its impending bankruptcy and shortly thereafter filed for bankruptcy protection. Thereafter, over 700 Consumers filed complaints with the Attorney General.

### F. Commonwealth's Complaint

In May 2008, the Commonwealth filed a comprehensive four-count complaint against Snyder and his employees, including Consultants, alleging they engaged in fraudulent or deceptive conduct prohibited by the CPL. For purposes of the preliminary injunction, we need focus only on Count II—Violations of the [CPL], Commonwealth v. [Consultants].[13] *See* R.R. at 30a–36a.

In Paragraphs 128–29 of its complaint, the Commonwealth alleges Consultants acted in the capacity of mortgage brokers and thus owed a fiduciary duty to act for the benefit of Consumers. *Id.* at 30a. In Paragraph 130, the Commonwealth alleges Consultants breached their fiduciary duty in numerous ways. *Id.* at 31a–33a.

In Paragraphs 131–35, the Commonwealth alleges Consultants violated the CPL. *Id.* at 33a–34a. More particularly, the Commonwealth alleges Consultants engaged in the following unfair or deceptive practices defined in Section 2(4) of the CPL:

(i) Passing off goods or services as those of another;

(ii) *Causing likelihood of confusion or of misunderstanding as to the source,* sponsorship, approval or certification *of* goods or *services*;

(iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

. . . .

(v) *Representing that* goods or *services have* sponsorship, approval, *characteristics,* ingredients, uses, *benefits, or quantities that they do not have* or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

. . . .

(vii) *Representing that* goods or *services are of a particular standard, quality or grade,* or that goods are of a particular style or model, *if they are of another*;

. . . .

(ix) Advertising goods or services with intent not to sell them as advertised;

. . . .

(xxi) *Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.*

73 P.S. §§ 201–2(4)(i), (ii), (iii), (v), (vii), (ix) and (xxi) (emphasis added).

Consultants Bennetch, Musser and Hunt filed preliminary objections to the Commonwealth's complaint alleging, among

---

**13.** The other counts included: Count I—Violations of the [CPL] Commonwealth v. Wesley Snyder and Sydney Snyder (R.R. at 23a–30a); Count III—Violations of the [CPL] Commonwealth v. Amy Lou Styer (R.R. at 36a–40a); and Count IV—Commonwealth v. Alicia Waid and Cheryl Bennetch (R.R. at 40a–46a).

other things, that the Commonwealth failed to state a claim under the CPL. Consultants' preliminary objections were overruled. Hepford–Rennie filed an answer to the complaint.

## G. Preliminary Injunction

Pursuant to Pa. R.C.P. No. 1531 and the CPL, the Commonwealth filed a motion for a preliminary injunction against Consultants and three other defendants seeking temporary injunctive relief and a freezing of their assets pending disposition of the lawsuit. *See* R.R. at 91a–104a. In late August 2008, the trial court held seven days of hearings on the requested injunction. The Commonwealth presented 15 witnesses, including a number of Consumers. It also called Consultant Bennetch for purposes of cross-examination. The Commonwealth submitted 87 exhibits, 86 of which were admitted.

Consultants Hepford–Rennie, Hunt and Musser testified in their own defense. Consultants submitted eight exhibits, but failed to move for their admission into the record. The trial court, on its own, called Cheryl Bennetch, OPFM's office manager, and asked her a limited number of questions.

■ At the close of the hearing, the trial court determined that the Commonwealth established the six prerequisites for a preliminary injunction.[14] The trial court also agreed with the Commonwealth that Consultants breached their fiduciary duty to Consumers and engaged in deceptive business conduct with Consumers. The trial court issued an order granting the following relief:

A. [Consultants] are restrained and enjoined from receiving monies and/or payments for services, as an employee or otherwise, pertaining to the provision of mortgage financing and/or investment products;

B. [Consultants] are restrained and enjoined from entering into contracts and/or agreements, oral verbal, and/or written, as an employee or otherwise, to provide mortgage financing and/or investment products;

C. [Consultants] shall within 20 business days of this order prepare and serve upon the Commonwealth a financial statement which lists all transfers and assignments of assets and property valued in excess of $2,500 since January 1, 2007, indicating the name and address of the transferee or assignee, the value of the transfer or assignment and the value of any consideration paid. . . .

D. A hearing to establish whether a permanent injunction should be entered will be held by the Court beginning at 9:30 a.m. on April 20, 2009. (R.R. at 963a)

In an opinion in support of its order, the trial court noted that mortgage brokers owe a fiduciary duty to their customers. *McGlawn v. Pa. Human Relations Comm'n*, 891 A.2d 757 (Pa.Cmwlth.2006).

14. A party seeking a preliminary injunction must establish that: (1) the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; (2) greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings; (3) a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the allegedly wrongful conduct; (4) the activity it seeks to restrain is actionable, its right to relief is clear and the wrong is manifest, or in other words, that it is likely to prevail on the merits; (5) the injunction it seeks is reasonably suited to abate the offending activity; and (6) a preliminary injunction will not adversely affect the public interest. *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 573 Pa. 637, 828 A.2d 995 (2003).

The court further recognized Consultants fell within the former Brokers' Act definition of a mortgage broker: "*A person who directly or indirectly negotiates* or places mortgage loans for others in the primary market for consideration." *See former* 63 P.S. § 456.302 (emphasis added). Therefore, the trial court determined Consultants owed a fiduciary duty to Consumers to act with the utmost candor, honesty and loyalty, and to provide all material information to their clients in order to allow them to make an informed decision as to whether to enter into a Wrap Mortgage.

The trial court further noted proof that Consultants violated their fiduciary duty in a number of ways. Consultants told Consumers that Snyder invested wisely in low risk mutual funds. Trial Ct. Op., 11/18/08, at 12. Consultants did not explain critical terms in the Wrap Mortgage providing that Consumers' conventional or "senior" mortgages remained in effect and that prepayments on their Wrap Mortgage would not accelerate Image Masters' obligation to apply that money to Consumers' conventional mortgages. *Id.* To the contrary, Consultants told Consumers the conventional mortgages were a mere formality and that the Wrap Mortgage was their only obligation. *Id.*

The trial court also referenced evidence that Consultants never advised Consumers they could include language in the Wrap Mortgage requiring that their conventional mortgages be paid off upon completion of their Wrap Mortgage payments. *Id.* Consultants also failed to advise Consumers the Wrap Mortgages were not recorded. *Id.* Further, the trial court referenced evidence that Consultants continued to sell Wrap mortgages to new Consumers even after being advised in May 2007 that OPFM could not make timely payments on the conventional mortgages. *Id.* at 13.

## II. Issues

Consultants' appeals to this Court followed.[15] Before us, Consultants contend the trial court erred or abused its discretion in granting preliminary injunctive relief because the Commonwealth failed to establish the six bases for a preliminary injunctive relief. In particular, Consultants assert the trial court erred in granting the preliminary injunction because (1) it is not necessary to prevent immediate and irreparable harm; (2) greater injury results from a grant of the injunction than a denial; (3) it does not restore the parties to the status quo; (4) there is no likelihood the Commonwealth will succeed on the merits; (5) it is not reasonably suited to abate an offending activity; and (6) a denial will not adversely affect the public interest.

Consultants Bennetch and Musser also contend the trial court erred or abused its discretion by permitting the Commonwealth to enter documents into the record that were not previously provided to Consultants' counsel, such that counsel could not properly and adequately cross-examine on the documents, and that the trial court erred or made findings not supported by the record in concluding the Commonwealth stated a claim against Consultants for a violation of the CPL. Additionally, Consultant Bennetch contends the trial court erred or abused its discretion by calling Defendant Cheryl Bennetch, his wife and OPFM's office manager, to testify after Consultants rested their case.

## III. Preliminary Injunction

■ Appellate court review of a trial court order granting or denying prelimi-

---

**15.** Both the trial court and this Court rejected Consultants' request to stay the injunction pending their appeals.

nary injunctive relief is *highly deferential* and is limited to determining whether the trial court abused its discretion. *Summit Towne Centre v. Shoe Show of Rocky Mount, Inc.*, 573 Pa. 637, 828 A.2d 995 (2003); *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277 (1992). "An abuse of discretion is not merely an error in judgment." *Ambrogi v. Reber*, 932 A.2d 969, 974 (Pa.Super.2007), *appeal denied*, 597 Pa. 725, 952 A.2d 673 (2008). "Rather, an abuse of discretion exists if the trial court renders a judgment that is [plainly] unreasonable, arbitrary or capricious, fails to apply the law, or was motivated by partiality, prejudice, bias or ill will." *Id.* "If the record supports the trial court's reasons and factual basis, the court did not abuse its discretion." *Id.* In addition, the facts are to be viewed in a light most favorable to the winner at the trial court level. *Maritrans.*

■ Further, when reviewing the grant or denial of a preliminary injunction, we will not inquire into the merits of the controversy, but instead we will examine the record only to determine if there were *any apparently reasonable grounds for the trial court's action. Shoe Show; Chatham Racquet Club v. Commonwealth, by Zimmerman*, 116 Pa.Cmwlth. 55, 541 A.2d 51 (1988). "We do not attempt to determine whether the party seeking the preliminary injunction is guaranteed to prevail...." *Ambrogi*, 932 A.2d at 980. Only where it is clear no grounds exist to support the decree or that the rule of law relied upon is plainly erroneous or misapplied will we interfere with the trial court's decision. *Shoe Show.* With these principles in mind, we review the trial court's determination here that the Commonwealth established the six prerequisites for a preliminary injunction.

## 1. Immediate and Irreparable Harm

■ A party seeking a preliminary injunction must show the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. *Shoe Show.* Consultants argue there is no threat of immediate and irreparable harm that cannot be compensated by money damages because OPFM is defunct, no Wrap Mortgages are being sold, and the pecuniary damages Consumers sustained are already fixed. *See W. Penn Specialty MSO, Inc. v. Nolan*, 737 A.2d 295 (Pa.Super.1999) (an injury is regarded as "irreparable" if it will cause damages that can be estimated only by conjecture and not by an accurate pecuniary standard).

■ As noted, the Commonwealth asserts a violation of statutory law constitutes irreparable injury. *See Pub. Util. Comm'n v. Israel*, 356 Pa. 400, 52 A.2d 317 (1947) (holding that a determination of irreparable harm is unnecessary where the legislature prohibited certain conduct). In particular, where the Commonwealth credibly alleges a violation of the CPL, irreparable harm will be presumed. *Commonwealth, by Fisher v. Richard A. Cole, M.D., Inc.*, 709 A.2d 994 (Pa.Cmwlth.1998). The Commonwealth also maintains the possibility of an unsatisfied money judgment in and of itself can constitute irreparable harm. *See Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186 (3rd Cir.1990).

■ We conclude the trial court had reasonable grounds regarding the irreparable harm prong. Irreparable harm is presumed where, as here, the Commonwealth alleges a credible violation of the CPL. *Israel; Cole.* Regardless of any fiduciary duty Consultants owed Consumers, the record supports the Commonwealth's allegations that Consultants engaged in deceptive conduct, as defined by

Section 2(4)(ii) of the CPL, 73 P.S. § 201–2(4)(ii) (causing likelihood of confusion or misunderstanding as to certification of goods or services); Section 2(4)(v) of the CPL, 73 P.S. § 201–2(4)(v) (representing that goods or services have benefits they do not have); and Section 2(4)(xxi) of the CPL, 73 P.S. § 201–2(4)(xxi) (engaging in other deceptive or fraudulent conduct which creates a likelihood of confusion or of misunderstanding).

As more fully set forth elsewhere in this opinion, a fact-finder could ultimately determine that Consultants caused the likelihood of confusion as to the source of funds used to pay the conventional mortgages and as to the identity of the primary mortgagees. Also, a fact-finder could determine that by handling the closings for conventional mortgages and Wrap Mortgages in the same manner and by failing to explain functional differences, Consultants misrepresented characteristics or qualities of the Wrap Mortgages as follows: that the Wrap Mortgages were valid and lawful mortgages; that the Wrap Mortgages functioned as to assume liabilities for the conventional mortgages; and that prepayment of the Wrap Mortgages would reduce liability on the conventional mortgages. Further, a fact-finder could determine that Consultants misrepresented the quality or grade of the investment services for the Wrap Payment by indicating that the money would be invested and that the investment would be safe. Moreover, a fact-finder could determine that given their general knowledge of the extremely unusual structure of the Wrap Mortgage Program and their specific knowledge of OPFM missing payments on conventional mortgages, certain Consultants engaged in deceptive conduct by continuing to market the Wrap Mortgages after June 2007. Our conclusions regarding these possible determinations are consistent with our highly deferential review.

## 2. Greater Harm

 A party seeking a preliminary injunction must show greater injury would result by refusing the injunction than by granting it. *DiLucente Corp. v. Pa. Roofing Co., Inc.*, 440 Pa.Super. 450, 655 A.2d 1035 (1995). Consultants argue the injunction is devastating to them, and this harm outweighs any benefit to the public. For example, Hunt cannot sell mortgages or investments. She expended large sums of money and time to pass the necessary tests for her state licenses. The injunction left her jobless. Hepford–Rennie argues she was just as much a victim of Snyder as Consumers, and thus to limit her ability to make a living is against the public interest. Musser asserts she can no longer pay household expenses and is forced to rely on friends and family to support her basic needs. Bennetch also argues his inability to work in the mortgage or investment field is extremely detrimental to him.

The Commonwealth counters the public's interest as a whole must be considered and the burden on Consultants, while difficult, is tolerable because greater harm to others is averted.

 We conclude that reasonable grounds exist for a determination that greater harm could result from refusing the injunction than from granting it. Here, Consultants turned a blind eye to the fact that the Wrap Mortgages were not legitimate mortgage products. In addition, the unrecorded nature of the Wrap Mortgage documents presented a serious public problem. The hundreds of unrecorded Wrap Mortgages acted to hinder regulatory oversight and to complicate liabilities for a huge number of individuals and conventional mortgage lenders. Moreover, Consultants' use of change of address forms to disrupt nor-

mal United States Postal Service communication between mortgagors and mortgagees, thereby concealing liability under the conventional mortgages, carries broad public implications. Use of unrecorded documents purporting to convey interest in land and redirection of mail can recur, to the public detriment, regardless of Snyder's confinement and OPFM's insolvency.

Most significantly, after June, 2007, Consultants knew of the extremely unusual nature of the Wrap Mortgage program and of OPFM missing payments on conventional mortgages. Most of the Consultants nevertheless continued to market the Wrap Mortgages, and none of the Consultants offered to prove they alerted any of their past Consumers to the problems. Given these acts and omissions in the face of knowledge, the fact-finder could conclude that Consultants felt no responsibility whatsoever to the homeowners with whom they dealt, and that only removal from the field pending complete review could provide protection to the public in the interim.

### 3. Restoration of Status Quo

■ A party seeking a preliminary injunction must show the injunction will properly restore the parties to their status as it existed prior to the alleged wrongful conduct. *Shoe Show.* Consultants assert a preliminary injunction is an interim measure designed to preserve the status quo and protect the parties until a hearing is held. *DiLucente Corp.* The status quo to be maintained is the last actual and lawful uncontested status, which preceded the pending controversy. *Valley Forge Hist. Soc. v. Washington Mem. Chapel,* 493 Pa. 491, 426 A.2d 1123 (1981). The purpose of preliminary injunctive relief is to maintain the status quo until the case can be investigated and adjudicated. *Israel.*

Consultants argue the status quo that must be maintained by the injunction is the legal status that preceded the pending controversy. They assert that prior to this lawsuit, they worked as mortgage consultants for OPFM. Thus, they maintain, in their prior legal status they could work in the mortgage field.

The Commonwealth counters that to reach the proper status quo the clock must be turned back to the time before Consultants began selling Wrap Mortgages. These products, and Consultants' sales of them, were unlawful under the CPL. The Commonwealth notes that prior to becoming a mortgage consultant for OPFM, Bennetch worked as an automobile salesman and Hunt worked in merchandising. Musser worked for a mortgage company in some capacity. Hepford–Rennie did not testify what she did.

■ We conclude the trial court had reasonable grounds to determine that the preliminary injunction will restore the parties to the status quo that existed prior to the alleged wrongful conduct. The proper status quo here is the status of the parties prior to the sale of Wrap Mortgages, the alleged wrongful conduct, not their status immediately prior to the lawsuit. *Ambrogi.*

### 4. Clear Right to Relief

■ A party seeking a preliminary injunction must show a clear right to relief. *Shoe Show.* To establish a "clear right to relief," the party seeking an injunction need not prove the merits of the underlying claim, but need only show that substantial legal questions must be resolved to determine the rights of the parties. *Fischer v. Dep't of Pub. Welfare,* 497 Pa. 267, 439 A.2d 1172 (1982). Thus, when reviewing an order granting a preliminary injunction, we do not inquire into the merits of the underlying action. *Shoe Show.*

Where, as here, the injunction is merely prohibitive rather than mandatory, we may reverse only if there are no reasonable grounds to support the decree or if the rule of law is palpably erroneous or misapplied. *Id.*

Consultants advance two fundamental arguments why the Commonwealth has not demonstrated a clear right to relief. First, Consultants contend they were merely mortgage *consultants*, not mortgage *brokers*. Therefore Consultants argue the trial court erred in finding they owed a fiduciary duty to Consumers. Second, Consultants assert they were merely employees with no knowledge of, or responsibility for, what OPFM did.

The Commonwealth counters it raised substantial legal questions as to both issues and thus the preliminary injunction must stand.

### a. Application of CPL to Consultants

Consultants contend the trial court erred in determining that the CPL applies to individual employees who themselves have committed no wrongdoing. Essentially, Consultants claim they cannot be held liable under the CPL for Snyder's wrongdoing.

The Commonwealth counters that the CPL applies to any "person" engaged in unfair or deceptive practices. In support, the Commonwealth cites *Moy v. Schreiber Deed Security Co.*, 370 Pa.Super. 97, 535 A.2d 1168 (1988). In *Moy*, the Superior Court held a corporate officer could be held individually liable under the participation theory for unfair or deceptive actions if there is positive proof he engaged in conduct prohibited by the CPL.

 We conclude the trial court had reasonable grounds to determine Consultants themselves actively participated in and played a vital role in the deceptive Wrap Mortgage scheme in violation of the CPL. The CPL is to be liberally construed to effectuate the legislative goal of consumer protection. *Commonwealth v. Percudani*, 844 A.2d 35 (Pa.Cmwlth.2004).

First, the record supports a determination that Consultants caused the likelihood of confusion as to the source of funds used to pay the conventional mortgages and as to the identity of the primary mortgagees. Section 2(4)(ii) of the CPL, 73 P.S. § 201–2(4)(ii) ("[c]ausing likelihood of confusion or of misunderstanding as to the source ... of ... services"). Section 2(4)(ii) of the CPL does not contain a discrete state-of-mind element, nor does it require a predicate fiduciary duty. As more fully set forth above, the likelihood of confusion occurred when Consultants presented a settlement sheet for the Wrap Mortgage which showed the conventional mortgage "assumed;" when Consultants discussed the Wrap Mortgage with Consumers at the settlement; and when Consultants had the Consumers sign a change of address form, so that the conventional mortgagee would not mail any information directly to Consumers. Testimony by Consumers supports a determination that the relative duties and liabilities created by the Wrap Mortgage and the conventional mortgage, and the ability to prepay a binding mortgage, were material to their decision to participate in the Wrap Mortgage program.

Also, by handling the closings for conventional mortgages and Wrap Mortgages in the same manner and by failing to explain functional differences, Consultants misrepresented characteristics or qualities of the Wrap Mortgages as follows: that the Wrap Mortgages were valid and lawful mortgages; that the Wrap Mortgages functioned as to assume liabilities for the conventional mortgages; and that prepayment of the Wrap Mortgages would reduce

liability on the conventional mortgages. Section 2(4)(v) of the CPL, 73 P.S. § 201–2(4)(v) ("[r]epresenting that ... services have ... characteristics ... or quantities that they do not have"). Section 2(4)(v) of the CPL does not contain a discrete state-of-mind element, nor does it require a predicate fiduciary duty. Testimony by Consumers supports a determination that the relative duties and liabilities created by the Wrap Mortgage and the conventional mortgage, and the ability to prepay a binding mortgage, were material to their decision to participate in the Wrap Mortgage program.

Further, as set forth in more detail below, Consultants misrepresented the quality or grade of the investment services for the Wrap Payment by indicating that the money would be invested and that the investment would be safe. Section 2(4)(vii) of the CPL, 73 P.S. § 201–2(4)(vii) ("[r]epresenting that ... services are of a particular ... quality or grade ... if they are of another"). Section 2(4)(vii) of the CPL does not contain a discrete state-of-mind element, nor does it require a predicate fiduciary duty. Testimony of Consumers supports a determination that the quality of investment services was material to their decision to make a Wrap Payment.

Moreover, given their general knowledge of the extremely unusual structure of the Wrap Program and their specific knowledge of OPFM missing payments on conventional mortgages, certain Consultants engaged in "other deceptive conduct" by continuing to market the Wrap Mortgages after June, 2007. Section 2(4)(xxi) of the CPL, 73 P.S. § 201–2(4)(xxi).

In sum, the referenced evidence provides reasonable grounds for an ultimate conclusion that Consultants engaged in unfair or deceptive acts or practices as defined by Section 2(4) of the CPL and declared unlawful by Section 3 of the CPL,

73 P.S. § 201–3. This evidence by itself is sufficient to satisfy the Commonwealth's burden with regard to this part of our preliminary injunction review. Although we view the following discussion of fiduciary duty unnecessary, we include it in the interests of completely responding to the parties' arguments.

### b. Fiduciary Duty

First, Consultants argue they were not licensed mortgage brokers and did not hold themselves out to be licensed mortgage brokers. Therefore, they assert, they owed no fiduciary duty to Consumers.

Bennetch argues he was merely an employee who took his directions and training from Snyder. Thus, Bennetch asserts, Snyder owed the fiduciary duty. Consumers filed complaints against Snyder, not him.

Musser advances a similar argument. She had no ownership interest in OPFM. She claims she was merely an OPFM employee. Consumers dealt with OPFM, not her. Thus, Musser claims she had no fiduciary duty to Consumers. In addition, Musser claims the evidence shows the breakdown in the Wrap Mortgage program occurred because Snyder failed to make the required investments. Musser asserts there is no allegation she had personal knowledge of any wrongdoing on the part of OPFM; therefore, she had no reason to know the investments were not being made. She argues that the CPL does not impose liability on parties who did not commit any wrongdoing and that the Commonwealth is attempting to hold her liable for the actions of others.

Musser also claims the corporate entity must be recognized and upheld unless unusual circumstances call for an exception. *S.T. Hudson Eng'rs, Inc. v. Camden Hotel Dev. Assocs.*, 747 A.2d 931

(Pa.Super.2000). Shareholders, officers and directors cannot be held liable absent establishment of the "participation theory" or successful assertion of the equitable doctrine of piercing the corporate veil. *First Realvest, Inc. v. Avery Builders, Inc.*, 410 Pa.Super. 572, 600 A.2d 601 (1991). Where the court pierces the corporate veil, only the owner is liable because the corporation is not a *bona fide* independent entity. *Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614, 470 A.2d 86 (1983). Employees are not vicariously liable for the acts of their employer. *Lambert v. Pittsburgh Bridge & Iron Works*, 463 Pa. 237, 344 A.2d 810 (1975).

■ Under the "participation theory," the court imposes liability on the participating individual as an actor, not as an owner. *Id.* To impose liability under the participation theory, a plaintiff must establish the individual engaged in misfeasance. The individual cannot be held personally liable for "nonfeasance," i.e., the omission of an act which a person ought to do. *Shay v. Flight C Helicopter Servs., Inc.*, 822 A.2d 1 (Pa.Super.2003).

Musser claims the Commonwealth failed to identify any conduct on her part that proximately caused Consumers harm. At most, Musser simply assisted in the mortgage application process. There is no allegation Musser had anything to do with the money.

■ Hepford–Rennie similarly argues she was merely an employee of a licensed mortgage broker and owed no fiduciary duty to Consumers. An omission of general information is only actionable where an independent or fiduciary duty to disclose information exists. *Weisblatt v. Minnesota Mut. Life Ins. Co.*, 4 F.Supp.2d 371 (E.D.Pa.1998). Hepford–Rennie points out that in *McGlawn*, the broker's activities were a substantial part of the loan transactions. The broker selected which lender received the customer's loan and was the sole negotiator with the ultimate lender. The broker also influenced the ultimate interest rate. The broker also received substantial sums from the loan proceeds. *See McGlawn*, 891 A.2d at 769. Here, Hepford–Rennie claims no such involvement.

In order to establish a fiduciary relationship, Hepford–Rennie asserts the Commonwealth must establish: 1) a relationship of actual closeness; 2) a substantial disparity in the parties' positions; and 3) actual reliance on the person of trust. *Weisblatt.* Hepford–Rennie also cites *In re Strong*, 356 B.R. 121 (Bkrtcy.E.D.Pa. 2004), where a federal bankruptcy court determined a mortgage company did not owe a fiduciary duty to borrowers and thus did not violate the CPL. In *Strong*, the plaintiffs claimed the defendant took advantage of their ignorance and omitted information and explanation of various refinancing charges and the disadvantages and risks of refinancing. The court, however, found the loan terms were fully disclosed in the documents and that the defendant had no affirmative duty to explain any terms to the plaintiffs. *See also Weisblatt* (insurance agent, who shared information at two 2–hour meetings for the purpose of selling insurance, did not owe a fiduciary duty to his insureds).

Hepford–Rennie further argues she did not breach any fiduciary duties if they exist. She explained to Consumers the Wrap Mortgage, their right to seek the advice of counsel, and their right of rescission.

Hunt advances a similar argument. She claims she was not a licensed mortgage broker, but simply a W–2 employee of OPFM. Hunt argues the Commonwealth's theory of liability would put millions of W–2 employees at risk of potential

liability for the wrongdoings of the company.

Hunt alternatively asserts she did not breach any fiduciary duties. She could not provide Consumers information about Snyder's investments because she was not a licensed investment advisor. Hunt claims her clients received a copy of the documents they signed at the Wrap Mortgage closing. Hunt further asserts there is no law requiring that loan documents be provided to borrowers prior to closing. Hunt also claims she never told Consumers their conventional mortgages were a mere formality. She made the same presentation to every client.

The Commonwealth counters the trial court correctly determined that Consultants, whether or not licensed mortgage brokers, performed all the functions of mortgage brokers and thus owed a fiduciary duty to Consumers. The Commonwealth asserts the fiduciary concept applies in a variety of contexts, not only to licensed mortgage brokers.

■ In support of its position, the Commonwealth cites *Basile v. H & R Block, Inc.*, 777 A.2d 95, 101 (Pa.Super.2001), where the Superior Court noted a fiduciary duty attaches when the circumstances make it clear that the parties are not on equal terms: "on the one side there is an overmastering influence, *or*, on the other, weakness, dependence, or trust, justifiably reposed." The fiduciary duty may attach "wherever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Id.* at 102. The Superior Court further stated in *Basile:*

> In other cases, where these relationships do not exist, confidential relations may still arise based on the facts and circumstances apparent on the record. Both our Supreme Court and other courts have recognized that those who purport to give advice in business may engender confidential relations if others, by virtue of their own weakness or inability, the advisor's pretense of expertise, or a combination of both, invest such a level of trust they seek no other counsel.

*Id.* at 102–03 (citations omitted).

The Commonwealth asserts Consultants dealt with and assisted generally unsophisticated clients, who, in turn, trusted and relied on Consultants. Thus, the trial court's determination that Consultants, either owed a fiduciary duty, or something in the nature of a fiduciary duty, to Consumers, is reasonable. At the least, the Commonwealth argues, the record raises substantial legal questions regarding the nature of the duty Consultants owed Consumers.

■ The trial court had reasonable grounds for determining Consultants owed a fiduciary duty to Consumers. Consumers trusted and relied on Consultants, who persuaded them to mortgage the equity in their property and turn it over to Snyder to invest.[16] A fiduciary duty attaches

---

**16.** For example, Consumer Inners testified he discussed Snyder's ability to invest money with Consultant Hepford–Rennie. She discussed investment return rates of 6%, 8% and 10%. R.R. at 754a. Inners testified: "When we were talking about the difference in these rates, I thought 10 percent sounded pretty optimistic; and she had indicated that people had been very happy with Wes Snyder's ability to invest and make money for them." *Id.* at 754a–55a. Consumer Fansler testified Consultant Bennetch told him the money was invested back in to the community, which he understood to be debt, bonds, municipal bonds or school bonds, something with a guaranteed low risk return. *Id.* at 872a. Consumer Penelope Tzafaras testified Consultant Hunt told her the Wrap Mortgage program was not dangerous and that she had sold Wrap Mortgages for ten years without a

where the circumstances make it clear the parties are not on equal terms. *Basile.*

Consultants' arguments that deny any duty to Consumers are troubling. The trial court could take into consideration an asserted lack of duty in evaluating the need for a preliminary injunction.

Additionally, given our highly deferential review, we conclude the trial court could determine Consultants breached a duty to Consumers. The nature of the discussions between Consultants and Consumers, set forth more fully in footnotes above, establish the perception that Consultants enjoyed superior knowledge of the investments to which Wrap Payments were supposedly put. A fact-finder could determine that a person employed for years in a professional office dealing with Wrap Payments, paid to describe and answer questions about Wrap Payments, and paid to arrange for receipt of the Payments, was in a significantly better position to determine what would be done with the Payments than a consumer who had never heard of the Equity Slide Down Program. In short, the circumstances could support an ultimate determination that Consultants appeared to have vastly superior access to knowledge about investment of the Wrap Payments than did Consumers. In the absence of realistic attempts to dispel this perception by Consultants, this apparently superior knowledge invited reliance by Consumers. A duty could arise from the unequal positions of the parties and reliance.

### 5. Abating the Offending Activity

■ A preliminary injunction must also be reasonably suited to abate the offending activity. *Shoe Show.* Here, Consultants contend OPFM is no longer in existence, Snyder is in prison and Wrap Mortgages are no longer being sold. Therefore, Consultants assert there is no longer any offending activity that the Commonwealth seeks to abate. Consultant Hunt adds, the Commonwealth failed to show that monetary damages alone would not be sufficient.

The Commonwealth counters the CPL contemplates enjoining future conduct based on past improper conduct. *Percudani.* An injunction is a reasonable way of preventing the possibility that Consultants will again sell Wrap Mortgages or other fraudulent mortgage products for someone else.

■ We conclude the trial court had reasonable grounds to determine the preliminary injunction is reasonably suited to abate the offending activity. Consultants deny any duty to Consumers, a situation fraught with concern for consumers who may deal with them in the future. Also, as discussed before, extensive use of unrecorded mortgage-type documents and redirection of mail communications can recur regardless of the current status of Snyder and OPFM.

Nonetheless, Consultants maintain the injunction is overly broad and unduly harsh. Consultants Bennetch and Musser

---

problem. *Id.* at 817a. Consumer O'Brien testified Consultant Musser told her that "most people don't have the knowledge or skill to do that to—invest that money." *Id.* at 780a. Because of the investments, Image Masters could give her a lower rate. *Id.* at 781a. If Musser would not have said they were going to invest the money, O'Brien would not have bothered with a Wrap Mortgage. *Id.*

In addition, Musser testified she told people Snyder invested in low risk mutual funds. *Id.* at 950a. She asked Snyder if Image Masters provided investment statements to Consumers. *Id.* Snyder replied that he did not do that. *Id.* Snyder felt he had a good enough reputation and that people needed to be comfortable with that. *Id.*

contend the Commonwealth's authority under the CPL is limited to promulgating regulations for the enforcement and administration of the CPL and restraining acts deemed to be violations of the CPL. They assert the CPL contains no authority permitting the Commonwealth to enjoin a person from working in their entire vocational field. Thus, Consultants assert the injunction is overly broad, unduly harsh, and takes away their right to earn a living.

The Commonwealth counters it persuaded the trial court that Consultants knowingly and persistently deprived Consumers of needed information, thereby actively participating in Snyder's illegal scheme. There is a risk Consultants could put their years of experience in fraudulent and deceptive schemes to work for another employer.

We conclude the trial court had reasonable grounds to enjoin Consultants from working in any capacity in mortgage financing or investment products pending disposition of the Commonwealth's CPL case against them. This is especially true where they claim no duty to unsuspecting consumers, despite an aura of superior knowledge.

### 6. Public Interest

■ A preliminary injunction cannot run counter to the public interest. *Shoe Show.* Consultants argue an injunction prohibiting them from earning a living when they did not knowingly engage in any malfeasance is against the public interest. Consultants claim to be just as much victims of Snyder as Consumers.

The Commonwealth counters that a consumer protection action is in the public interest. In this case, approximately 811 Consumers were victimized by the Wrap Mortgage scheme alone.

■ We conclude the trial court had reasonable grounds to determine that preliminarily enjoining Consultants, who participated to various extents in the Wrap Mortgage scheme, is in the public interest. The number of Consumers and conventional mortgage lenders potentially affected by the Wrap Mortgage program, the extensive use of unrecorded mortgage-like documents which hindered regulatory oversight, and the redirection of mail communications sufficiently impact the public interest to support the trial court's injunction.

### IV. Evidentiary Rulings

Consultants Bennetch and Musser also assert the trial court erred and abused its discretion by permitting the Commonwealth to enter documents into evidence that were not made available to Bennetch and Musser prior to the preliminary injunction hearing. They assert the Commonwealth had nearly three months to exchange information and that before trial the trial court directed the exchange of all documentation the parties intended to offer into evidence.

■ However, in their briefs, neither Bennetch nor Musser cite to any place in the record where the trial court made a ruling on either party's objection to the admission of a particular document. Because neither Bennetch nor Musser developed this argument in their briefs, this issue is deemed waived. See *In re Condemnation of Land for the S.E. Cent. Bus. Dist. Redevelopment Area # 1: (405 Madison Street, City of Chester)*, 946 A.2d 1154 (Pa.Cmwlth.), *appeal denied,* 600 Pa. 772, 968 A.2d 233 (2008) and *cert. denied sub nom., Brown v. Redevelopment Auth. of City of Chester, Pa.,* —— U.S. ——, 129 S.Ct. 2054, 173 L.Ed.2d 1134 (2009) (arguments not properly developed in a brief will be deemed waived by this Court); *see*

*also* Pa. R.A.P. 2119(c) (stating the argument portion of a brief must set forth a reference to the place in the record where the matter referred to appears).

■ Consultant Bennetch further asserts the trial court abused its discretion by calling Defendant Cheryl Bennetch to the stand on its own accord after her counsel rested her case. However, the trial court did not issue an injunction against Cheryl Bennetch, and, Consultant Bennetch acknowledges, "[i]t is not clear whether the trial court took into consideration any of Defendant Cheryl Bennetch's testimony in making the decision to enter preliminary injunctions against the other defendants." Consultant Bennetch's Br. at 25. In fact, the trial court called Cheryl Bennetch as a witness in her own defense, not to testify regarding any other defendant. *See* R.R. at 961a–62a. Consequently, at most, the trial court's decision was harmless error.

### V. Preliminary Objections

■ Consultants Bennetch and Musser also assert trial court erred in denying their preliminary objections. However, as the Commonwealth points out, orders dismissing preliminary objections are not appealable orders. *F.D.P. v. Ferrara,* 804 A.2d 1221 (Pa.Super.2002) (an order denying preliminary objections does not put a litigant out of court as to anything; it is not "final" and cannot be certified under Pa. R.A.P. 341(c); and, it is not an interlocutory order appealable as of right under Pa. R.A.P. 311). Accordingly, we quash the appeal of Consultants Bennetch and Musser to the extent they seek review of

the trial court's order denying their preliminary objections.

### *O R D E R*

**AND NOW,** this 9th day of June, 2009, for the reasons stated in the foregoing opinion, the order of the Court Common Pleas of Berks County granting a preliminary injunction against Appellants Jacqueline Hepford–Rennie, Julie Ann Musser, Susan Louise Hunt, and Kenneth Roger Bennetch is **AFFIRMED.**

Further, Appellants Bennetch's and Musser's appeals are **QUASHED** to the extent their appeals seek review of the Common Pleas Court's order denying their preliminary objections.

DISSENTING OPINION BY Senior Judge FRIEDMAN.

I respectfully dissent. The majority concludes that the Court of Common Pleas of Berks County (trial court) had reasonable grounds to grant the preliminary injunction sought by the Commonwealth of Pennsylvania, Acting By Attorney General Thomas W. Corbett, Jr. (Commonwealth), and to enjoin Kenneth Bennetch, Julie Ann Musser, Jacquelyne Hepford–Rennie and Susan Louise Hunt (together, Consultants) from receiving payments for, or entering into contracts for, the provision of mortgage financing and/or investment products services. I cannot agree that the trial court had reasonable grounds where the Commonwealth failed to meet its burden of establishing all of the prerequisites for a preliminary injunction.[1]

1. A party seeking a preliminary injunction must show that: (1) an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; (2) greater injury would result from refusing an injunction than from granting it; (3) an injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) the right to relief is clear; (5) the injunction it seeks is reasonably suited to abate the offending activity; and (6) an injunction will

Consultants were employed as mortgage consultants by business entities engaged in the provision of mortgage financing and investment products services. As such, Consultants advised potential customers of the availability of two alternative forms of financing: (1) a conventional loan secured by a mortgage from an outside lending institution; and (2) a conventional loan secured by a mortgage from an outside lending institution, coupled with a wrap-around mortgage (Wrap Mortgage) offered by Image Masters, Inc. (Image Masters), one of the business entities.

The Wrap Mortgage option provided the customer with a lower interest rate and lower monthly mortgage payments. In exchange, the customer was required to obtain a conventional loan for an amount in excess of his or her need and pay the excess money to Image Masters to invest for the customer.[2] If the customer chose a Wrap Mortgage, there were two closings. The first closing was held on the conventional loan before a title insurance company representative. The second closing was held approximately one week later, usually at the customer's home, at which time the customer executed the Wrap Mortgage with Image Masters and turned over the excess funds received from the conventional loan. Thereafter, the customer made a single mortgage payment to Image Masters at the reduced interest rate, and Image Masters used that payment, plus a portion of the money earned from invest-

ment of the excess funds, to make the larger conventional loan payment, leaving Image Masters with a profit consisting of the money remaining from the investment of the excess funds.

In September 2007, the business entities became the subject of a federal bankruptcy proceeding. Subsequently, Wesley Alvin Snyder, the President and sole shareholder of the business entities, was arrested and charged with numerous federal offenses arising from the sale of Wrap Mortgages. In November 2007, Snyder pled guilty to one count of mail fraud. At a later date, Snyder received a sentence of no less than twelve years and two months in federal prison.

On May 23, 2008, the Commonwealth filed a complaint and motion for preliminary injunction against Consultants and others, alleging that Consultants were engaged in the operation of a "Ponzi Scheme" in connection with the sale of Wrap Mortgages.[3] The Commonwealth also alleged that Consultants had violated various provisions of section 2(4) of the Unfair Trade Practices and Consumer Protection Law (CPL),[4] which, generally speaking, makes it unlawful to engage in deceptive conduct that creates a likelihood of confusion or misunderstanding with respect to the sale of goods or services.

After a preliminary injunction hearing, the trial court concluded that, because

---

not adversely affect the public interest. *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 573 Pa. 637, 828 A.2d 995 (2003). For a preliminary injunction to issue, a petitioner must establish **every one of these prerequisites**; if the petitioner fails to establish any one of them, there is no need to address the others. *Id.*

2. Thus, in order to qualify for a Wrap Mortgage, the customer was required to have sufficient equity in his or her home.

3. At some point, Image Masters was unable to get sufficient investment returns to cover the conventional loans of Wrap Mortgage customers. Thus, Image Masters stopped investing the excess funds, instead using the excess funds from one Wrap Mortgage customer to pay money owing on the conventional loans of other Wrap Mortgage customers.

4. Act of December 17, 1968, P.L. 1224, *as amended*, 73 P.S. § 201–2(4).

Consultants functioned as "mortgage brokers" as defined in section 2 of the Mortgage Bankers and Brokers and Consumer Equity Protection Act (Brokers Act),[5] Consultants owed a fiduciary duty to their customers. The trial court then concluded that Consultants breached the fiduciary duty of candor, honesty and loyalty by failing to disclose material information about the Wrap Mortgages so that the customers could make an informed decision. As a result, the trial court preliminarily enjoined Consultants from receiving payments for, or entering into contracts for, the provision of any mortgage financing and/or investment products services. Consultants now appeal to this court.[6]

## I. Right to Relief

Consultants argue that the Commonwealth failed to establish that its right to relief is clear. I agree that the Commonwealth failed to establish that its right to equitable relief in the form of a permanent injunction is clear.

Our supreme court has stated that, where injunctive relief is sought, the initial focus is whether equity jurisdiction is proper.[7] *Department of Public Welfare v. Eisenberg*, 499 Pa. 530, 454 A.2d 513 (1982). Where a statutorily prescribed remedy at law is available, equity will not intervene without a clear showing that the remedy is inadequate. *Id.*

One of the Commonwealth's witnesses testified that the legislature enacted a new law, effective November 5, 2008, that would require loan originators to be licensed, to meet preliminary and continuing education requirements and to pass a test. (N.T. at 819–20, R.R. at 896a.) The witness testified that Consultants would be considered loan originators under the new law. *Id.* Thus, today, Consultants could not work as loan originators unless they were to meet new education requirements, pass a test and obtain a license.[8]

Section 6102 of the act known as the Mortgage Loan Industry Licensing and Consumer Protection Act (Mortgage Originator Act), the new law, defines the term "mortgage originator," in pertinent part, as follows:

> An individual not licensed as a . . . mortgage broker . . . who solicits, accepts or offers to accept mortgage loan applications, or negotiates mortgage loan terms, in other than a clerical or ministerial capacity and who is personally in

5. Act of December 22, 1989, P.L. 687, repealed by section 3(b)(1) of the Act of July 8, 2008, P.L. 796, formerly 63 P.S. § 456.302. The subject matter is now covered in the statute codified at 7 Pa. C.S. § 6102. "Mortgage broker" was defined in the Brokers Act as a "person who directly or indirectly negotiates or places mortgage loans for others in the primary market for consideration." 63 P.S. § 456.302.

6. In reviewing a trial court order granting a preliminary injunction, this court examines the record to determine if there were any apparently reasonable grounds for the action. *Summit Towne Centre.*

7. The Attorney General may seek an injunction under the CPL, but that statutory authority does not excuse the Attorney General from establishing all of the prerequisites for a preliminary injunction, including a clear right to equitable relief.

8. Although the Mortgage Originator Act was not in effect on August 29, 2008, when the trial court issued the preliminary injunction, the trial court was aware of its enactment through the testimony of the Commonwealth's witness. Thus, the trial court knew that the law would affect whether the Commonwealth had a clear right to a permanent injunction after November 5, 2008. Assuming, for the sake of argument, that the Commonwealth established all other prerequisites for a preliminary injunction, the trial court should have issued a temporary injunction **that ended as of November 5, 2008.**

direct contact, in writing, including electronic messaging, or by voice communication, with consumers with regard to the solicitations, acceptances, offers or negotiations.

7 Pa.C.S. § 6102. Section 6131(g) of the Mortgage Originator Act requires that mortgage originators meet certain educational requirements, pass a test prior to licensing and meet additional educational requirements after licensing. 7 Pa.C.S. § 6131(g).

Upon receipt of an application for a mortgage originator license, the Department of Banking may conduct an investigation of the applicant. Section 6133(a.1) of the Mortgage Originator Act, 7 Pa.C.S. § 6133(a.1). The Department of Banking may deny a license, or otherwise restrict a license, if it finds that the applicant does not possess the character, reputation, integrity and general fitness to command the confidence of the public and to warrant the belief that the mortgage loan business will be operated lawfully, honestly, fairly and in accordance with the law. Section 6133(e)(4) of the Mortgage Originator Act, 7 Pa.C.S. § 6133(e)(4).

The Mortgage Originator Act is now in effect, providing various means for controlling individuals who, like Consultants, provide information to consumers regarding mortgage loan products. The Commonwealth, in order to establish a clear right to equitable relief in the form of a permanent injunction, would have to prove that the new measures will be ineffective in preventing Consultants from harming consumers in the manner alleged in this case. Given the requirements of the new law, especially the authority of the Department of Banking over the licensing of mortgage originators, I would conclude that the Commonwealth failed to establish a clear right to a permanent injunction here.[9]

## II. Status Quo

Consultants argue that the Commonwealth failed to establish that the injunction properly restores them to their status as it existed immediately prior to the alleged wrongful conduct. I agree.

The alleged wrongful conduct is failing to disclose material information about Wrap Mortgages, a failure that initially occurred after Consultants were hired to explain to customers two financing options, a conventional mortgage and a Wrap Mortgage. The fact that Consultants gave customers information about conventional mortgages as well as Wrap Mortgages is significant because the Commonwealth did not establish any wrongdoing relating to the conventional mortgages. Indeed, the Commonwealth's own witness, a Department of Banking investigator, testified that "there were no problems with Mr. Snyder's conventional mortgages." (N.T. at 814, R.R. at 895a.)

Thus, the injunction should have restored Consultants to their status as employees in the mortgage financing field, the status they held immediately prior to making any representations to any customers about Wrap Mortgages. In that status, Consultants could have continued to earn a living by providing conventional mortgage products and services, but not Wrap Mortgages. However, the injunction here places Consultants in a status that pre-dates their employment in the mortgage financing field. Thus, the injunction does not properly restore Con-

---

9. Indeed, if the Department of Banking, which provided a witness for the Commonwealth in this case, were to determine that Consultants are not fit to work as mortgage originators, the Department of Banking would not issue licenses to them.

sultants to their status as it existed immediately prior to the alleged wrongful conduct.

### III. Reasonably Suited to Abate Offending Activity

Consultants argue that the Commonwealth failed to establish that the injunction is reasonably suited to abate the offending activity, i.e., the failure to disclose material information about Wrap Mortgages to customers. I agree.

In *Armstrong School District v. Armstrong Education Association*, 5 Pa. Cmwlth. 387, 291 A.2d 125, 127 (1972) (footnote omitted) (citations omitted), this court stated:

> The history of equity jurisdiction in Pennsylvania is different from that in other states. Courts of Chancery existed here in colonial times, but public prejudice was so strong against them that they were abolished after the Revolution. Courts of Common Pleas thereafter exercised only common law powers, and possessed none of the powers of a Court of Chancery. [In 1836], some power to grant relief in equity was again given to the courts of Philadelphia County, and, through subsequent legislation and Constitutional provisions, these powers were later expanded and granted to all common pleas courts in the Commonwealth. These powers are still limited, however, and the extent to which they may be exercised lies within the control of the Legislature.

> A Pennsylvania court's equity jurisdiction, therefore, is limited and well defined.... "The courts of equity of Pennsylvania do not possess the general powers of a court of equity, but only such as have been conferred upon them by statute...."

Here, section 4 of the CPL states that whenever the Attorney General has reason to believe that any person is using any method, act or practice declared **unlawful** by the statute, the Attorney General "may bring an action ... against such person to **restrain** by temporary or permanent injunction the use of **such** method, act or practice." 73 P.S. § 201–4 (emphasis added). Section 4 of the CPL does **not** give courts statutory authority to restrain **lawful** activity.

To abate the offending activity here, the trial court needed only to enjoin Consultants from providing Wrap Mortgage products and/or services to consumers. Such an injunction would have protected future customers from losing money in any Wrap Mortgage "Ponzi Scheme" and would have allowed Consultants to continue working in the mortgage financing field. By enjoining Consultants from providing **any** mortgage financing and/or investment products and services, the trial court abated activity that was legal and harmed no one. In issuing such an injunction, the trial court exceeded the equitable powers given under the CPL, and, because the injunction unnecessarily enjoined the continuation of legal activity, the injunction was not reasonably suited to abate the offending activity.

Accordingly, I would vacate the preliminary injunction.