IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Todd Ankiewicz, Terry Fitzsimmons, :
David Pugh, Anthony Josephite, :
                Appellants :
  :
  v. : No. 1287 C.D. 2017
  : ARGUED: September 12, 2018
Benton Township, Pennsylvania, by :
and through The Benton Township :
Board of Supervisors :

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE ELLEN CEISLER, Judge
             HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                      FILED: October 22, 2018

Appellants Todd Ankiewicz, Terry Fitzsimmons, David Pugh, and Anthony Josephite (collectively Appellants) appeal the Court of Common Pleas of Lackawanna County's (Trial Court) August 9, 2017 Order, through which the Trial Court granted in part and denied in part Appellants' statutory zoning appeal. This appeal pertained to the Benton Township Board of Supervisors' (Board)[1] February 17, 2016 decision to grant Applicants Laura and Robert Schneider's Conditional Use Application (Application), thereby allowing them to use a portion of a property located at 871 Marshbrook Road, Factoryville, Pennsylvania (Property or Schneider Property) as a junkyard. After thorough review, we affirm the Trial Court's Order.

The Schneider Property is roughly 32.5 acres and is located in Benton Township's "Rural Agricultural" zoning district. Board's Findings of Fact and

---

[1] Benton Township and the Benton Township Board of Supervisors are the Appellees in the matter.

Conclusions of Law (Board's Findings of Fact) at 1. On September 4, 2015, the Schneiders filed their Application, requesting authorization to establish a junkyard on a 7.8 acre panhandle- shaped section of land at the Property's northern end. Board's Findings of Fact at 1; Board Hr'g. Exs. 2 & 3.[2] Section 404.1 of Benton Township's Zoning Ordinance lists "Junkyards" as an *authorized conditional use* in Benton Township's Rural Agricultural zoning district. *See* BENTON TWP., PA., ZONING ORDINANCE ART. IV, § 404.1 (2003) (Zoning Ordinance).

On December 1, 2015, Benton Township Zoning Officer Mimi Seymour submitted a report to the Board recommending the Board members visit the Schneider Property. Ms. Seymour also declared that the Application was in compliance with the Zoning Ordinance. Two site visits were conducted by the Board during the late fall and winter of 2015. *See* Board's Findings of Fact at 1.

On December 7, 2015, the Board held a public hearing regarding this Application. Mr. Schneider testified in support, explaining that he planned to bring late-model vehicles into the junkyard, drain them of fluids in an open-air, fenced-in

---

[2] Per Zoning Ordinance § 303, a "Junk Yard" is

> [a]n area of land, with or without buildings, used for the storage, outside a completely enclosed building, of junk as defined by this Ordinance, with or without the dismantling, processing, salvage, sale or other use or disposition of the same. The following shall also be considered junk yards:
>
>> A. The outside storage or deposit on a lot of two (2) or more abandoned or junked vehicles; and,
>>
>> B. The outside storage or deposit on a lot of one (1) or more mobile/manufactured homes that are not inhabitable condition; and,
>
> Vehicle sales lots managed by licensed vehicle dealers operated in accord with the Township Zoning Ordinance shall not be considered junk yards.

80' by 90' "staging area," store them outside in rows for an indeterminate amount of time, and use a barn-type structure for automobile assembly and repairs. Notes of Testimony (N.T.), 12/7/15, at 11-12, 22. According to Mr. Schneider, no disassembly would occur on the premises, and an off-site scrap yard would handle the crushing of the junkyard's vehicles as necessary. *Id.* at 14. The junkyard would be, at its closest point, 100 feet from the property line, would be shielded from view by trees, some of which were already present and others that Mr. Schneider would plant himself, and would gradually expand from an initial 178' by 50' footprint as the junkyard's business increased, with the eventual goal of using the entire 7.8 acre section as a junkyard. *Id.* at 12-18.

At the hearing, Todd Ankiewicz, who owns 135 acres of land near the Schneider Property, expressed his concerns about the junkyard's potential deleterious effects upon the surrounding land and water sources, the "undesirable crowds" that it would draw, the traffic it would create, and whether the Schneiders had sufficient liability insurance to cover any claims arising from damage caused to neighboring properties. N.T., 12/7/15, at 56-58.

Mr. Ankiewicz also questioned Mr. Schneider about his previous experience or training in operating a junkyard or in handling and disposing of toxic chemicals and waste materials. *Id.* at 24-31, 60. Mr. Schneider responded that he did not consider vehicle fluids to be toxic, the knowledge he had gained through working in the mining industry and running a quarry would be transferrable to his new business, and he would operate in compliance with all applicable regulations, including those issued by the Pennsylvania Department of Environmental Protection (DEP). *Id.* at 25-31.

3

Anthony Josephite, a neighbor who lives directly west of the proposed junkyard, testified at this hearing as well. Mr. Josephite presented satellite imagery printouts showing the area in and around the Schneider Property. *Id.* at 31-32. Mr. Josephite used these images to point out that the junkyard would be on a hill overlooking his property. Mr. Josephite challenged Mr. Schneider's claim that his proposed screening would adequately shield the neighbors' view of the junkyard. *Id.* at 32-48. In addition, Mr. Josephite expressed concern that the junkyard's hours of operation and noise would negatively impact the surrounding neighbors' ability to use and enjoy their properties. *Id.* at 49-52. Mr. Josephite next suggested that the Board members had not done a proper walkthrough of the Schneider Property and that the Board should conduct "a steep slope investigation" to determine whether other portions of the Zoning Ordinance applied to the Application. *Id.* at 52-54. Finally, Mr. Josephite questioned whether the Application sufficiently established that removal of chemicals and fluids would be done on impervious surfaces, which he claimed was necessitated by the Zoning Ordinance.[3] *Id.* at 55.

In response, Mr. Schneider said he had never been cited by the DEP, and expressed his belief that the contamination threat posed by the chemicals and fluids was infinitesimally small. *Id.* at 61-62. He also acknowledged that there was a steep incline between Mr. Josephite's property and the Schneider Property, but said he "would never put [the junkyard] in the line of sight of where [the neighbors] could see it." *Id.* at 62-63. Finally, he suggested that his junkyard would not negatively affect nearby property values, because there is another junkyard "in our area." *Id.* at 64-67.

---

[3] Mr. Josephite did not cite an Ordinance section that specifically requires the draining of fluids in junkyards to be done on impervious surfaces.

4

The last witness was Terry Fitzsimmons, who expressed concerns about contamination of the aquifer beneath the Schneider Property and the surrounding area, which Mr. Fitzsimmons also relied upon for water. *Id.* at 67-68. Mr. Fitzsimmons stated that he had "approximately 20 years of experience dealing with chemicals and chemistry that are very similar to what's found in a junkyard" and was troubled by the Schneiders' failure to produce "any credentials . . . or any specifics on methods that are going to be used to ensure that there's no leakage or leachate of chemicals." *Id.* at 68. Mr. Fitzsimmons explained that he had dealt with several situations, in both personal and professional capacities, where chemicals infiltrated the ground and contaminated far away sources of water, and he asked Mr. Schneider how he planned to ensure that something similar would not happen here. *Id.* at 68-72, 75-77. In response, Mr. Schneider stated that he would "do the best that [he could] to make sure that there's no spills and that anything [that does spill] is going to be cleaned up." *Id.* at 72-75. The Board then closed the record and took the matter under advisement. *Id.* at 79-80.

On February 17, 2016, the Board held a "special meeting" at which the Board unanimously granted the Schneiders' Application. Appellants' Br. at 12; Appellees' Br. at 8. The Board determined "that the Schneiders . . . demonstrated through their Application materials and testimony at hearing that their junkyard is a type of use permitted by conditional use[.]" Board's Findings of Fact at 4. However, the Board also found that Appellants had rebutted the presumption that the

> proposed use is consistent with the general welfare . . . in part, by demonstrating that the use as proposed, in terms of the specific size and location of the junkyard area and fluid drainage staging area could adversely affect public welfare in terms of potential visibility and groundwater issues, in a way not normally expected from the type of use. This is primarily because of the proposed location of

5

the junkyard at an elevation higher than the Josephite property and the proposed draining of fluids outdoors in the proposed staging area.

*Id.* at 5.

To address these concerns, the Board imposed the following 28 conditions:[4]

> 1. The Schneiders' . . . Application for the operation of a junk yard is hereby approved subject to the following conditions:
>
> 2. The setback of the junkyard area from the boundary line with the Josephite property shall be increased to 125 feet.
>
> 3. This conditional use approval is only for the use of a portion of the panhandle area of the Schneider Property measuring approximately 150' x 350' beginning from the 100 foot setback from the property boundary with the Pugh property and 125 foot from the property boundary with the Josephite property.
>
> 4. The draining of fluids from vehicles shall only be conducted on an impervious surface inside Barn 1 and shall not be conducted out of doors. Vehicles shall be drained of all fluids prior to their placement in the junkyard area.
>
> 5. No more than 50 used tires shall be stored on the property at any given time.
>
> 6. All vehicles shall be removed from the Schneider Property within 12 months from cessation of the junkyard and salvage business.
>
> 7. This approval is for a junk yard for later model (not older tha[n] ten (10) years from the then current model year) automobiles and recreational vehicles and recreational trailers only. No other type of junk yard is authorized by this approval.
>
> 8. This approval also includes the use of the existing Barn 1 for salvage operations.

---

[4] Though the Board's Findings of Fact lists 29 numbered conditions of approval, the first condition of approval is merely a prefatory statement, meaning that only 28 are substantive in nature.

9. Compliance with State and Federal Law. The operation shall comply with all applicable state and federal rules and regulations, including but not limited to those of the [DEP] and all state required permit and reporting information shall be made available to [Benton] Township upon request.

10. Responsible Parties. It shall be the ultimate responsibility of the property owner of the premises upon which any junk is situated and the owner of any such junk to comply with the Zoning Ordinance and to provide for the removal of such junk and remediation of any environmental problems associated with any junk.

11. Fencing. Prior to commencement of operations and the placement of any junk, the junk yard shall be enclosed by a chain link fence not less than eight (8) feet in height. All gates shall be closed and locked when the junk yard is closed for business. All fences and gates shall be maintained in good repair and in such a manner as not to become unsightly. There shall be no advertising of any kind placed on the fence. This fencing requirement is applicable to only that portion of the property being immediately used for the storage of junk and the staging area and is not applicable to the balance of the property owned or used by the operator so long as the remaining portion of land is not being used for the storage of junk as defined in the Zoning Ordinance.

12. Screening. Prior to the commencement of junk yard operations, an evergreen vegetative screen as proposed in the . . . [A]pplication must be planted on the . . . [P]roperty on the three sides of the junk yard area that border adjacent properties. The evergreen vegetative screening shall be maintained in the setback area on the . . . [P]roperty set forth below and in such fashion as to continue to provide the required screening.

13. Setbacks. The fence enclosing the junk yard and any structure associated with the junk yard shall not be less than one hundred (100) feet from any public road right-of-way, one hundred (100) feet property boundary with the Pugh property, one hundred twenty five (125) feet from the property boundary with the Josephite property one

7

hundred and fifty (150) feet from any existing principal residential or commercial structures.

14. Dumping. The premises shall not be used as a dump area for any solid waste as defined in the zoning ordinance.

15. Burning. No burning whatsoever shall be permitted on the premises.

16. Water Bodies. The junk yard area shall not be located less than two hundred (200) feet from any body of water, stream, wetland or well.

17. Fire and Explosion Hazards. The operation shall be equipped with adequate safety devices against the hazard of fire and explosion and adequate fire-fighting and fire suppression equipment and devices standard in the industry are required.

18. Fire Lanes. Fire lanes of a minimum width of twenty (20) feet shall be maintained so that no area of junk shall span a distance of more than fifty (50) feet.

19. Hours of Operation/Noise. Any activity associated with the operation of the junk yard that produces any noise audible beyond the property line shall be conducted only between the hours of 7:00 a.m. and 8:00 p.m. During business hours, an adult attendant shall, at all times, remain on the premises. No transporting of cars to and/or from the junkyard area or work within the junkyard area shall be conducted on Saturdays or Sundays.

20. Stacking of Junk. Junk vehicles or major parts thereof shall not be stacked on top of any other junk vehicle or major part. No junk shall be stacked or piled to a height of greater than ten (10) feet.

21. Nuisances. The premises shall, at all times, be maintained so as not to constitute a nuisance, or a menace to the health, safety and welfare of the community or to the residents nearby, or a place for the breeding or harboring of rodents and vermin. Within two (2) days of arrival on the premises, all glass shall be removed from any broken windshield, window or mirror. Grass and weeds on the premises shall be kept mowed.

22. Waste. Waste shall not be stored outside and shall not be accumulated or remain on any premises except

8

temporarily awaiting disposal in accordance with the Zoning Ordinance. The junk yard shall be operated and maintained in compliance with any state or federal regulations governing the disposal of solid or liquid waste.

23. Fireproof Structures. Every structure erected upon the premises after the date of this approval and used in connection with the junk yard shall be a fireproof construction.

24. Lighting. Any outside lighting must be shaded with no lumens crossing property lines or escaping upward to the night sky.

25. Hazardous Materials. All batteries, coolants, gasoline, diesel fuel, engine oil, any other petroleum products and any other noxious or potentially contaminating materials must be removed from all junk within two (2) working days after arrival to the premise[s] and shall be disposed of in a manner meeting all state and federal requirements. Such liquids and materials, while stored on the premises, shall be kept separately in leak-proof container at a central location on the premises.

26. Water Monitoring. If the junkyard area and staging area include ten (10) or more vehicles in total, the well on the Schneider [P]roperty shall [be] sampled [by the Schneiders] every three months for chemical constituents and compounds associated with fluids from automobiles and recreational vehicles. Copies of the water sampling results shall be retained for the life of the operation and shall be made available to [Benton] Township for review and inspection upon request.

27. Inspections. [Benton] Township shall make such inspections, conduct tests or sampling, or examine books, papers and records as it deems necessary to determine compliance with this Approval and/or the . . . Zoning Ordinance and, for this purpose, the duly authorized agents and/or employees of [Benton] Township shall be allowed entry at all reasonable times to examine the property and junk yard operations. The owner, operator or other person in charge of the property and/or junk yard shall give such agents and employees free and unrestricted entry and access to conduct such inspections, sampling investigations or examinations.

28. All material removed from the non-coal surface mining operation located on the premises shall be only used on the premise and shall not be sold for any off premises use.

29. The acreage used for the junk yard shall not be counted as area available for horses pursuant to Section 805.2 of the . . . Zoning Ordinance.

Board's Findings of Fact at 5-8.

Appellants appealed the Board's decision to the Trial Court. Appellants argued that the Board had not appropriately weighed certain pieces of evidence and had imposed insufficiently stringent conditions of approval. Appellants further argued that approval of the Application violated various sections of the Zoning Ordinance. *See* Land Use Appeal at 3-5.

On June 23, 2016, at a hearing before the Trial Court, Appellants asked the Trial Court to consider additional evidence beyond that which had been presented to the Board. N.T., 6/23/16, at 20-22.[5] The Trial Court granted this request via a June 29, 2016 Order, declaring that "the record shall be allowed to be opened and this [Trial] Court will take into evidence anything additional that the PARTIES wish to present[.]" Tr. Ct. Order, 6/29/16, at 1 (emphasis in original).

On January 26, 2017, the Trial Court convened an evidentiary hearing. Appellants summoned Mr. Schneider to testify as of cross, during which he admitted he had "no experience in the junkyard business[,]" he was currently doing vehicle repairs on the Schneider Property, and he had not yet erected screening or conducted

---

[5] The Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, reenacted by Section 2 of the Act of December 21, 1988, *as amended*, P.L. 1329, 53 P.S. §§ 10101-11202, allows a trial court to take additional evidence if necessary when dealing with a zoning appeal. *See* Section 1005-A of the MPC, 53 P.S. § 11005-A. In such a circumstance, the trial court reviews the entire record, including the additional evidence and that produced by the zoning administrative body whose decision has been appealed, and must apply a *de novo* standard of review. *De Cray v. Zoning Hearing Bd. of Upper Saucon Twp.*, 599 A.2d 286, 287 (Pa. Cmwlth. 1991).

groundwater testing. N.T., 1/26/17, at 6-13. In addition, Mr. Schneider disputed evidence presented by Appellants showing he had been cited previously by the DEP for operating a quarry without a permit,[6] expressed uncertainly about whether his homeowner's insurance policy would cover his junkyard operations, and asserted there was sufficient fire safety hardware in the junkyard. *Id.* at 13-25. Finally, Mr. Schneider stated he did not know whether any Benton Township employees had inspected the Property to verify the Schneiders' compliance with the Board's conditions of approval. *Id.* at 25-28.

Appellants next elicited testimony from Tom Kelly, who was qualified by the Trial Court as an insurance expert. *Id.* at 28-30, 32-33. Mr. Kelly testified that it was unlikely that a homeowner's insurance policy would cover claims related to junkyard operations, and that a failure to properly notify one's insurance company of such commercial operations could result in claim denials or even outright revocation of the homeowner's policy. *Id.* at 30-35.

Appellants then called Larry Seymour, one of the Board members who had approved the Application. Mr. Seymour declared that "to the best of [his] knowledge[,]" the Schneiders had not submitted a list of the junkyard's "potential hazards and details of planned safety and accident response action" to the local fire department, as was required by Section 701.4 of the Zoning Ordinance. *Id.* at 38-42. Mr. Seymour opined that the Board would have considered the Schneiders' aforementioned DEP violation as important information, if the violation had been brought to the Board's attention. *Id.* at 42-47. However, he still believed that the numerous conditions of approval that had been imposed would allow the junkyard to operate in a manner compatible with the surrounding area and would safeguard

---

[6] Mr. Josephite testified that he had retrieved the Schneiders' DEP violation notice from the DEP's website. N.T., 1/26/17, at 82-83.

11

the neighboring properties. *Id.* at 47-52. Finally, Mr. Seymour stated that the Board does not examine insurance coverage issues when considering a conditional use application. *Id.* at 53-57.

Mr. Fitzsimmons then testified, essentially reiterating his earlier testimony before the Board regarding his concerns that junkyard fluids would leach into the soil and contaminate the groundwater. Finally, Mr. Schneider returned to the stand and continued to defend his business practices. *Id.* at 64-84.

Approximately eight months later, the Trial Court issued the following decision:

> AND NOW, on this 9[th] day of August 2017, upon consideration of oral argument and a reading of the parties' memoranda of law, the [Trial] Court GRANTS the Appellants' land use appeal in part and denies in part.
>
> [The Trial] Court, in its appropriate scope of review in this matter finds that [Appellants] met their burden in demonstrating that the [Board] manifestly abused its discretion or committed an error of law in failing to enact sufficient conditions in granting the subject conditional use permit. Namely, the conditions imposed by the [Board] failed to ensure that the essential character of the neighborhood would not be sufficiently altered by the [Schneiders'] operation of a junkyard. Accordingly, the February 17, 2016 decision of the . . . Board . . . is modified to include the following additional conditions of approval:
>
>> 1. The junkyard shall be enclosed by a chain link fence not less than ten (10) feet in height.
>>
>> 2. All other requirements pertaining to the installation of the fence as detailed in item number 11 of [the Board's Findings of Fact] remain in effect.
>>
>> 3. Any activity associated with the operation of the junkyard that produces noise audible beyond the property line shall be conducted only between the hours of 8:00 a.m. and 6:00 p.m. In addition, no transportation of cars to and/or from the junkyard

12

> area or work within the junkyard . . . shall be conducted on Saturdays, Sundays, or national holidays.
>
> The remaining conditions set forth in the February 17, 2016 decision by the Benton Township Board of Supervisors are specifically incorporated herein by reference and said decision is AFFIRMED in all other respects.

Tr. Ct. Order, 8/9/17, at 1-2 (emphasis in original). This Appeal followed.

Appellants present a number of arguments on appeal, which we have condensed and reordered for ease of discussion.

First, Appellants note that, since the Trial Court took additional evidence, it was required to issue findings of fact and conclusions of law after completing its review. Appellants' Br. at 34-35 (citing 53 P.S. § 11005-A[7] and *Mitchell v. Zoning Hearing Bd. of Mount Penn*, 838 A.2d 819 (Pa. Cmwlth. 2003)). Appellants claim it is impossible for our Court to conduct a proper review of the Trial Court's decision,

---

[7] If, upon motion, it is shown that proper consideration of the land use appeal requires the presentation of additional evidence, a judge of the court may hold a hearing to receive additional evidence, may remand the case to the body, agency or officer whose decision or order has been brought up for review, or may refer the case to a referee to receive additional evidence, provided that appeals brought before the court pursuant to [53 P.S. § 10916.1] shall not be remanded for further hearings before any body, agency or officer of the municipality. If the record below includes findings of fact made by the governing body, board or agency whose decision or action is brought up for review and the court does not take additional evidence or appoint a referee to take additional evidence, the findings of the governing body, board or agency shall not be disturbed by the court if supported by substantial evidence. If the record does not include findings of fact or if additional evidence is taken by the court or by a referee, the court shall make its own findings of fact based on the record below as supplemented by the additional evidence, if any.

53 P.S. § 11005-A.

13

since the Trial Court did not issue its own findings of fact and conclusions of law, or author an opinion in which it articulated its reasoning. Appellants argue that we should therefore reverse the Trial Court. Appellants' Br. at 35-37.

Our Court has held that in zoning matters where a trial court considers additional evidence, it may elect to adopt an administrative zoning body's factual conclusions, as long as the adopted items address the evidence which was presented before the zoning body. *See Appeal of Chester Cty. Outdoor, LLC*, 167 A.3d 280, 290 (Pa. Cmwlth. 2017); *see also McNew v. Zoning Hearing Bd. of East Marlborough Twp.* (Pa. Cmwlth., No. 1425 C.D. 2016, filed July 20, 2017), slip op. at 6-7 (noting, without comment, that the trial court adopted administrative zoning body's findings of fact as its own after reviewing a zoning appeal using a *de novo* standard, albeit with some additions).

Such was the case here. With the exception of the insurance issue[8] and Mr. Schneider's alleged DEP violation, the evidence received by the Trial Court was essentially a rehashing of many of the issues presented by Appellants before the Board. Furthermore, the undisputed and robust factual record from the Board and the Trial Court enables us to adequately conduct our appellate review of the Trial Court's decision. For these reasons, we do not find a remand necessary. *See Mitchell*, 838 A.2d at 826; *Rayel v. Bridgeton Twp. Zoning Hearing Bd.*, 511 A.2d 933, 935 (Pa. Cmwlth. 1986).

Turning to the substantive issues in this appeal, Appellants essentially raise similar arguments that they presented to the Board and the Trial Court. Appellants generally "assert that the record contains evidence that [the Schneiders' junkyard] activities will constitute a nuisance and have a noxious effect on the surrounding

---

[8] The issue of inadequate insurance was not raised by Appellants in this appeal.

area due to collection and transfer of toxic chemicals, pollutants, and other potential threats to the ground water and environment, noise pollution, and the proximity of the junkyard to existing and proposed residential structures." Appellants' Br. at 30. Appellants also claim that the numerous conditions of approval imposed by the Trial Court do not adequately address the threat to the community posed by the junkyard. Specifically, Appellants maintain:

1. The Trial Court erred by approving the Application despite the Schneiders' failure to comply with Section 701.4 of the Zoning Ordinance, which requires a landowner to submit a hazard report and safety plan for review by the local fire department where the proposed use for the land will involve "any manufacturing, production, storage[,] transfer or disposal of, inflammable and explosive materials[.]" Appellants' Br. at 20-22;[9]

2. The Trial Court did not impose stringent enough water testing conditions pursuant to Section 701.12 of the Zoning Ordinance, which addresses protection of surface water and groundwater, when approving the Application. *Id*. at 22;

3. The Trial Court disregarded Sections 1104(E)(6) and 1104(E)(8) of the Zoning Ordinance, which require consideration of the adequacy of "water supply and sewage disposal facilities [as well as] . . . of fire lanes and other emergency zones and the provision of fire hydrants[,]" when reviewing a conditional use application. *Id.* at 22-23. Appellants assert

---

[9] Benton Township argues that Appellants waived this issue by failing to raise it before the Board. We disagree. Though Mr. Josephite did not specifically mention Section 701.4 during his testimony before the Board, Section 701 explicitly states "[t]he following performance standards shall apply to all proposed new or expanded nonresidential uses, and residential uses explicitly referenced by a specific section." Zoning Ordinance § 701 (emphasis in original). The phrase "following performance standards" refers to all requirements listed in this portion of the Zoning Ordinance, which necessarily includes those listed in Section 701.4. Thus, Appellants preserved this issue, due to Mr. Josephite's testimony during the Board's December 7, 2015 hearing regarding both Section 701 and performance standards, coupled with Section 701's incorporation of those performance standards, and Appellants' subsequent references to the Schneiders' noncompliance with Section 701.4. *See* N.T., 12/7/15, at 51-52; Land Use Appeal at 4; Br. in Support of Land Use Appeal at 18; Statement of Errors at 1-2; Appellants' Br. at 20-22.

15

that the infrastructure on and near the Property is inadequate to satisfy the requirements of Sections 1104(E)(6) and 1104(E)(8). Appellants' Br. at 22-23;

4. The Trial Court erred by not giving enough weight to the Schneiders' failure to erect proper screening before receiving a license to operate the junkyard. *Id.* at 23-24 (citing Zoning Ordinance § 820.3(D));[10]

5. The Trial Court did not sufficiently address concerns about the junkyard's proximity to neighboring properties, or about the effect of elevation differences upon the Schneiders' ability to sufficiently shield the junkyard from outside view. *Id.* at 26-28;

6. The Trial Court erred by not giving enough weight to the fact that the Schneiders were operating the junkyard prior to obtaining Board approval of the Application and had no previous experience operating junkyards. *Id.* at 23, 28;

7. The Trial Court should have conditioned approval upon the Schneiders' compliance with all applicable Environmental Protection Agency (EPA) and DEP regulations. *Id.* at 28-29;

8. The Trial Court failed to address or consider one of the Zoning Ordinance's express goals, which is to "MAINTAIN [BENTON] TOWNSHIP'S EXISTING RURAL-AGRICULTURAL CHARACTER AND QUALITY LIFESTYLE; AND, CONSERVE OPEN LAND, AGRICULTURAL LAND, AND FOREST LAND AS AN IMPORTANT ELEMENT OF THE LOCAL ECONOMY[,]" when making its decision. *Id.* at 30-31 (citing Zoning Ordinance § 201 (emphasis in original));

---

[10] Section 820.3(D) reads, in relevant part:
> Setbacks - The fence enclosing any junk yard and any structures associated with the junk yard shall be located not less than one hundred (100) feet from any public road right-of-way, one hundred (100) feet to any property line or one hundred and fifty (150) feet from any principal residential or commercial structures existing at the time of adoption of this Ordinance.

Zoning Ordinance § 820.3(D).

9. The Schneiders never actually established that the Application "complie[d] with the [applicable] objective standards and criteria" of the Zoning Ordinance, meaning that "the burden [of proof] never, technically, shifted to [Appellants to show that the junkyard would likely] . . . have a detrimental impact on the public health, safety and welfare [beyond that normally expected for a junkyard]." *Id.* at 24-25. Therefore, "the Trial Court . . . *defacto* [sic] sustained [Appellants'] Land Use Appeal." *Id.* at 26;

10. The Trial Court should have directed the Schneiders to submit an environmental impact statement pursuant to Section 703 of the Zoning Ordinance. *Id.* at 31-32.

## Analysis

We note at the outset that neither Appellants nor Appellees articulated or applied the correct standard of review in their respective briefs. Appellants argued that the Trial Court's decision was erroneous because many of the imposed conditions of approval were not supported by substantial evidence or resulted from improperly weighed evidence. *See* Appellants' Br. at 19-33. Appellees asserted that this Court must consider whether the Board *and* Trial Court abused their discretion or committed errors of law. *See* Appellees' Br. at 14-27.

Neither formulation is accurate. Where a trial court elects to take additional evidence when considering a zoning appeal, it must apply a *de novo* standard of review and, consequently, supplants the zoning administrative body as the exclusive finder-of-fact. *See Levin v. Twp. of Radnor*, 681 A.2d 860, 863 (Pa. Cmwlth. 1996). Here, the Trial Court's decision, not the Board's, is the subject of this appeal. Our scope of review is "limited to determining whether or not the Trial Court abused its discretion or committed an error of law." *Monroe Meadows Housing Partnership, LP v. Municipal Council of Municipality of Monroeville*, 926 A.2d 548, 551 (Pa. Cmwlth. 2005).

17

In light of this limited standard of review, we must avoid the inclination to measure and assess the multitude of factors and considerations that support a zoning ruling, and "must exercise self-restraint as to substituting our opinions far removed from the particular zoning hearing for the well-considered decision of [the factfinder]." *Cohen v. Zoning Bd. of Adjustment*, 276 A.2d 352, 355 (Pa. Cmwlth. 1971). "It is, after all, the sole function of the . . . fact finder to evaluate witness credibility and assign evidentiary weight." *Lower Allen Citizens Action Grp., Inc. v. Lower Allen Twp. Zoning Hearing Bd.*, 500 A.2d 1253, 1258 (Pa. Cmwlth. 1985) (punctuation omitted). Indeed, the "fact finder is the ultimate judge of credibility and resolves all conflicts in the evidence," *Eichlin v. New Home Borough Zoning Board*, 671 A.2d 1173, 1175 (Pa. Cmwlth. 1996), and has "the power to reject even un-contradicted testimony if it finds it lacking in credibility." *Lower Allen*, 500 A.2d at 1258.

With regard to conditional uses,

> The [MPC] provides that a zoning ordinance may contain "provisions for conditional uses to be allowed or denied by the governing body pursuant to public notice and hearing and recommendations by the planning agency and pursuant to express standards and criteria set forth in the zoning ordinances." Section 603(c)(2) of the MPC, 53 P.S. § 10603(c)(2). A conditional use is nothing more than a special exception which falls within the jurisdiction of the municipal governing body rather than the zoning hearing board. As in the case of special exceptions, the uses which may be established or maintained as conditional uses are prescribed by the zoning ordinance and the standards to be applied to the granting or denial thereof are set forth in the zoning ordinance. A special exception is not an exception to the zoning ordinance, but rather a use to which the applicant is entitled provided the specific standards enumerated in the ordinance for the special exception are met by the applicant.

*In re Thompson*, 896 A.2d 659, 670 (Pa. Cmwlth. 2006) (internal citations and footnote omitted). Section 913.2(a) of the MPC states, in relevant part, "[i]n granting a conditional use, the governing body may attach such reasonable conditions and safeguards, in addition to those expressed in the ordinance, as it may deem necessary to implement the purposes of this act in the zoning ordinance." 53 P.S. § 10913.2.

> Because, under the MPC, the Board, utilizing its grant of discretionary power to make a judgment, can impose conditions "it may deem" necessary, a court reviews a challenge **to the reasonableness of those conditions**; it does not determine whether there is substantial evidence, which is a "fact standard," but whether **those conditions constitute an abuse of discretion**. Like in any abuse of discretion review, the Board is not required to support the imposition of conditions; rather, the opposite is true- property owners are required to show that the imposition of conditions was an abuse of discretion.

*Leckey v. Lower Southampton Twp. Zoning Hearing Bd.*, 864 A.2d 593, 596 (Pa. Cmwlth. 2004) (emphasis added).

Abuse of discretion is defined as "a judgment that is plainly unreasonable, arbitrary or capricious, fails to apply the law, or was motivated by partiality, prejudice, bias or ill will." *Com. ex rel. Corbett v. Snyder*, 977 A.2d 28, 41 (Pa. Cmwlth. 2009) (brackets omitted) (quoting *Ambrogi v. Reber*, 932 A.2d 969, 974 (Pa. Super. 2007)).

> However . . . a zoning hearing board [cannot] devise conditions out of thin air and without any reference to the record evidence. Rather, a reasonable condition must (1) relate to a standard in the applicable zoning ordinance or in the [MPC] and (2) be supported by evidence in the record before the zoning hearing board. If the condition does not satisfy these requirements, then the landowner proves an abuse of discretion.

*Whitehall Fiduciary, LLC v. Zoning Hearing Bd. of Twp. of Whitehall*, 49 A.3d 945, 948 (Pa. Cmwlth. 2012) (internal citations and quotation marks omitted). Therefore,

19

in order to prevail, Appellants must show that the conditions of approval imposed by the Trial Court, in its *de novo* capacity, are untethered to, or violate, either the MPC or Zoning Ordinance, and are not supported by record evidence. A careful review of the record reveals that the Trial Court did not abuse its discretion in adopting, with some minor modifications, the conditions imposed by the Board.

Cognizant of this standard of review, we now address the merits of Appellants' arguments.

First, Appellants claim that the Trial Court erred in approving the Application before requiring the Schneiders to comply with Section 701.4 of the Zoning Ordinance. Section 701.4 states:

> All activities involving any manufacturing, production, storage, transfer, or disposal of, inflammable and explosive materials shall be provided with adequate safety devices against the hazard of fire and explosion and adequate fire-fighting and fire suppression equipment and devices standard in the industry shall be required. Burning of waste materials in open fires is prohibited. The relevant provisions of Federal, State and local laws and regulations shall also apply. Details of the potential hazards and details of planned safety and accident response actions shall be provided by the developer for review by the local fire company(s). In the case of conditional uses and special exceptions, larger setbacks, additional buffer area or fencing may be required by the Township if the nature of the proposed use as determined by the Township so requires.

Zoning Ordinance § 701.4. This Section does not specify precisely *when* a conditional use applicant must submit a hazard report and safety plan to the local fire department. Given this ambiguity, the law requires that we interpret Section 701.4 in the Schneiders' favor to mean that filing their report and plan was not a prerequisite for approval of their Application. *See Kohl v. New Sewickley Twp.*

20

*Zoning Hearing Bd.*, 108 A.3d 961, 968 (Pa. Cmwlth. 2015) ("[W]here the words of [a zoning] ordinance are ambiguous, courts construe the ordinance in favor of the landowner."). Furthermore, the Trial Court made its decision in the Schneiders' favor expressly contingent upon their adherence to several fire safety-related conditions, including prohibiting on-premises burning, mandating installation and usage of "adequate safety devices against the hazard of fire and explosion and adequate fire-fighting and fire suppression equipment and devices standard in the [junkyard] industry[,]" setting minimum fire lane and maximum junk pile widths, and requiring all junkyard structures built after the Application's approval to be fireproof. Board's Findings of Fact at 7. Thus, the Trial Court's approval of the Application was in accord with the requirements of Section 701.4.

Second, the Trial Court's decision to allow the Schneiders to build and operate a junkyard on their Property did not contravene Section 701.12 of the Zoning Ordinance, which pertains to protection of surface water and groundwater. The Trial Court granted approval of the conditional use, in part, upon the following four conditions that address Section 701.12: All vehicle fluid drainage would have to be done inside the Schneiders' barn on an impervious surface; the junkyard had to be located at least 200 feet "from any body of water, stream, wetland or well"; all hazardous materials had to be removed from the premises within two days of the material's arrival, properly disposed of in compliance with all applicable laws, and stored together at the junkyard in a safe manner prior to removal; and the Schneiders would have to conduct quarterly groundwater tests once the junkyard held 10 or more vehicles. Board's Findings of Fact at 6-8. The Schneiders voluntarily agreed

to comply with the first of these requirements,[11] while the latter three essentially mirror the language of Sections 820.3(G),[12] (H),[13] and (I)[14] of the Zoning Ordinance.

---

[11] The Zoning Ordinance does not explicitly mandate that drainage of hazardous liquids in a junkyard occur either indoors or on an impervious surface.

[12] "Water Bodies - No junk yard shall be located less than two hundred (200) feet from any body of water, stream, wetland or well." Zoning Ordinance § 820.3(G).

[13]      Hazardous Materials - In cases where the junk yard includes ten (10) or more junk vehicles or where the Board of Supervisors deems it necessary to meet the intent of this Ordinance, and to further protect ground water and surface water, all batteries, coolants, gasoline, diesel fuel, engine oil, any other petroleum products and any other noxious or potentially contaminating materials must be removed from all junk within two (2) working days after arrival to the premises and shall be disposed of in a manner meeting all state and federal requirements. Such liquids and materials, while stored on the premises, shall be kept separately in leak-proof containers at a central location on the premises.
Zoning Ordinance § 820.3(H).

[14]      Water Quality - In cases where the junk yard includes ten (10) or more junk vehicles or where the Board of Supervisors deems it necessary to meet the intent of this Ordinance, the owner of any junk yard shall be required to monitor the ground and surface water in the vicinity of the junk yard. Water testing shall be conducted every three (3) months on any stream located on the premises or any stream within five hundred (500) feet of any area used for the storage of junk if water drainage from the junk yard area is to said stream. For each testing period two (2) samples shall be collected; one sample shall be taken from the stream at a point upstream of the junkyard drainage area and one sample shall be taken from the stream at a point below the junk yard drainage area. In addition, the well located on the premises shall also be sampled every three months. The samples shall be collected and analyzed by a certified water analysis laboratory for hydrocarbons or other parameters deemed appropriate by the Board of Supervisors, and results shall be provided to the Township. If said samples exceed the limits

Thus, the Trial Court did not commit an abuse of discretion with regard to compliance with Section 701.12, as these four conditions are reasonably calculated to ensure that the Schneiders' junkyard operation does not contaminate surface or groundwater in the area.

Third, Appellants presented no evidence to either the Board or the Trial Court that there were inadequate water supply and sewage disposal facilities, fire lanes, other emergency zones, or fire hydrants in and around the Property, such that approval of the Application would run afoul of Zoning Ordinance Section 1108.4(E)(6) or Section 1108.4(E)(8). Furthermore, the Board (and thus the Trial Court by adopting the Board's Findings of Fact) made clear it had factored Section 1108's requirements into its analysis, but did not express any concerns regarding the sufficiency of such safety-related items in and around the junkyard.  *See* Board's Findings of Fact at 4-8.

Fourth, Appellants waived their argument that the Trial Court should have required the Schneiders to install proper screening prior to approving the Application, as they did not raise that issue before either the Board or the Trial Court. *See Newtown Square E., L.P. v. Twp. of Newtown*, 38 A.3d 1008, 1017 (Pa. Cmwlth. 2011), *aff'd,* 101 A.3d 37 (Pa. 2014); *In re McGlynn*, 974 A.2d 525, 534 (Pa. Cmwlth. 2009); Pa. R.A.P 302(a).

Fifth, the Trial Court did address concerns relating to the junkyard's aesthetic and nuisance-related prospective impact upon neighboring properties. It did so by ordering installation of 10' fencing and vegetative screening around the junkyard;

---

established by the Pennsylvania Department of Environmental Protection, the junkyard shall cease operation until such time as the source of the contamination has been identified and corrected.

Zoning Ordinance § 820.3(I).

23

limiting the junkyard's hours of operations; insisting that the junkyard's premises be suitably maintained; and mandating setback requirements, as to the junkyard's distance from both the property line and primary structures on other properties, some of which exceeded those required under the Zoning Ordinance. *See* Board's Findings of Fact at 5-7; Tr. Ct. Order, 8/9/17, at 1-2.

The conditions imposed by the Trial Court reflect the language of the following Zoning Ordinance Section 820.3(B), related to fencing around junkyards;[15] Section 820.3(C), related to screening around junkyards;[16] Section 820.3(D), related to setbacks for junkyards;[17] Section 820.3(K), related to hours of

---

[15]  Fencing - All junk yards shall be completely enclosed by a chain link fence not less than eight (8) feet in height. Said fence shall be completed within six (6) months after the effective date of this [Zoning] Ordinance for existing junk yards and prior to the issuance of a license for a new junk yard. All gates shall be closed and locked when closed for business. All fences and gates shall be maintained in good repair and in such a manner as not to become unsightly. There shall be no advertising of any kind placed on the fence. The foregoing fencing provisions shall be applicable only to that portion of the premises being immediately used for the storage of junk and shall not be applicable to the balance of the property owned or used by said junk yard operator so long as said remaining portion of land is not being used for the storage of junk as defined in this Ordinance.

Zoning Ordinance § 820.3(B).

[16]  Screening - All junk yards shall be screened, to the satisfaction of the Board . . . , from any adjoining or neighboring property, any public road right-of-way, or any other premises; and, natural vegetative cover shall be maintained in all required setback areas. Vegetative plantings of sufficient height and density, berms, topography or fencing of such design may be used to effect the required screening as determined by the Board . . . . All screening shall be maintained in such fashion as to continue to provide the required screening.

Zoning Ordinance § 820.3(C).

[17]  *See* note 10 *supra*.

24

operation of junkyards;[18] and Section 820.3(M), related to nuisance issues of junkyards.[19] As the conditions imposed generally reflect the mandates of the pertinent requirements for operation of junkyards, they are reasonable and the Trial Court did not abuse its discretion by electing to address the junkyard's potential aesthetic and nuisance-related effects in such a manner.

Sixth, the Trial Court did not err by declining to give weight to the Schneiders' alleged operation of the junkyard before obtaining approval of the Application, or to their lack of prior experience with running this kind of business. While Mr. Schneider did admit that he "handled some cars" on the Property prior to the Board's approval of the Application, *see* N.T., 12/7/15, at 25, the Certified Record does not contain evidence showing that he was operating a junkyard prior to the Application's approval. Furthermore, a zoning decision must be predicated upon the particulars of the parcel, not the landowner's experience or other factors that "are disassociated from the land itself[.]" *Hammond v. Zoning Hearing Bd. of Borough of Stroudsburg*, 564 A.2d 1324, 1328 (Pa. Cmwlth. 1989).

---

[18] <u>Hours of Operation</u> - Any activity associated with the operation of the junk yard that produces any noise audible beyond the property line shall be conducted only between the hours of 7:00 a.m. and 8:00 p.m. During business hours, an adult attendant shall, at all times, remain on the premises.

Zoning Ordinance § 820.3(K).

[19] <u>Nuisances</u> - All premises shall, at all times, be maintained so as not to constitute a nuisance, or a menace to the health, safety, and welfare of the community or to the residents nearby, or a place for the breeding of rodents and vermin. Within two (2) days of arrival on the premises, all glass shall be removed from any broken windshield, window or mirror, and all trunk lids, appliance doors and similar closure devices shall be removed. Grass and weeds on the premises shall be kept mowed.

Zoning Ordinance § 820.3(M).

Seventh, Appellants' claim that the Trial Court should have required the Schneiders to successfully "obtain all DEP and/or EPA licenses necessary for a junkyard . . . as a condition precedent to approving conditional use zoning relief" is misplaced. Appellants' Br. at 28-29. This is for two reasons: It would have made no sense for the Schneiders to get the relevant state and federal environmental agencies' consent, prior to obtaining authorization to establish the junkyard in the first place. Additionally, the Trial Court expressly conditioned approval upon the Schneiders' "compl[iance] with all applicable state and federal rules and regulations, including but not limited to those of the [DEP.]" Board's Findings of Fact at 6. The conditions imposed by the Trial Court therefore mandate that the Schneiders obtain all DEP and/or EPA licenses necessary for a junkyard.

Eighth, as already noted, the Trial Court approved the Application, imposing 28 conditions that the Trial Court believed would allow the junkyard to operate within the parameters of the Zoning Ordinance. *See* Tr. Ct. Order, 8/9/17, at 1-2. This fatally undermines Appellants' claim that the Trial Court did not consider the Zoning Ordinance's goals in approving the Application.

Ninth, the Trial Court did not sustain Appellants' appeal in a *de facto* sense, as Appellants assert. Instead, the Trial Court imposed additional conditions of approval, which the Trial Court determined would correct the putative deficiencies of the Board's February 17, 2016 decision to ensure that the junkyard would operate in a manner that complied with both the express language and the underlying purpose of the Zoning Ordinance.

Finally, the Trial Court did not commit an abuse of discretion by declining to order the Schneiders to submit an environmental impact statement. Section 703 of the Zoning Ordinance states:

> The Board . . . Planning Commission, or Zoning Hearing Board, as the case may be, may, based upon the nature of a project and potential impacts on the Township, require the developer to prepare and submit to the Township an environmental impact statement (EIS) for the following types of developments and uses . . . 3. Junkyards[.]

Zoning Ordinance § 703. The Trial Court chose not to exercise this discretionary power and, instead, elected to address the junkyard's potential environmental impact through the aforementioned conditions of approval. Given that those conditions were relatively comprehensive in nature, this does not constitute an abuse of discretion.

## Conclusion

We are mindful of Appellants' understandable fears concerning the potential impact of the Schneiders' proposed junkyard upon their rural community. However, we must also acknowledge that Benton Township has decided as a matter of public policy to permit the operation of junkyards as a conditional use in its Rural Agricultural zoning district. Benton Township has thus determined that such a use is, under the right circumstances, compatible with the health, safety, and welfare of the community. Our review is limited to determining whether the Trial Court committed an abuse of discretion in approving the conditional use. After our careful review of the record, we find that Appellants have not met their burden of proving that the Trial Court failed to apply the law, was motivated by partiality, prejudice, bias or ill will, or that the conditions imposed were plainly unreasonable, arbitrary or capricious. For these reasons, we affirm the Trial Court.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Todd Ankiewicz, Terry Fitzsimmons, :
David Pugh, Anthony Josephite, :
            Appellants :
             :
         v. : No. 1287 C.D. 2017
             :
Benton Township, Pennsylvania, by :
and through The Benton Township :
Board of Supervisors :

## O R D E R

AND NOW, this 22nd day of October, 2018, the Court of Common Pleas of Lackawanna County's (Trial Court) August 9, 2017 Order is hereby AFFIRMED.


_____
ELLEN CEISLER, Judge